**COYOTE LAKE RANCH, LLC, Petitioner,**

v.

**The CITY OF LUBBOCK, Respondent**

NO. 14–0572

Supreme Court of Texas.

Argued October 14, 2015

Opinion delivered May 27, 2016

Rehearing Denied September 23, 2016

Rachel Anne Ekery, Wallace B. Jefferson, Alexander Dubose Jefferson & Townsend LLP, Austin, TX, Cullom Brantley Jones, Marvin W. Jones, Sprouse Shrader

Smith, PLLC, Amarillo, TX, Jennifer Ruth Josephson, Roger D. Townsend, Alexander Dubose Jefferson & Townsend LLP, Dallas, TX, for Petitioner.

Jeffrey C. Hartsell, Chief Litigation Attorney, Richard K. Casner, Crenshaw, Dupree & Milam, LLP, Lubbock, TX, Dale Wainwright, Lindsay E. Hagans, Bracewell LLP, Austin, TX, for Respondent.

Doug Caroom, Bickerstaff Heath Delgado Acosta LLP, Austin TX, for Amicus Curiae Canadian River Municipal Water Authority.

Arthur G. Uhl III, Uhl, Fitzsimons, Jewett & Burton, San Antonio TX, for Amicus Curiae Texas & Southwestern Cattle Raisers Association.

Andy McSwain, Daniel Nesbitt MacLemore IV, Fulbright Winniford PC, Waco TX, for Amicus Curiae Texas Farm Bureau.

Harriet O'Neill, Law Office of Harriet O'Neill, PC, Austin TX, Lisa Bowlin Hobbs, Kuhn Hobbs PLLC, Austin TX, for Amicus Curiae The Land Owner Coalition of Texas.

Dylan O. Drummond, Squire Patton Boggs (US) LLP, Dallas TX, for Amicus Curiae The Texas City Attorneys Association and The Texas Municipal League.

CHIEF JUSTICE HECHT delivered the opinion of the Court, in which JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE GUZMAN, JUSTICE DEVINE, and JUSTICE BROWN joined.

 Absent an agreement to the contrary, an oil-and-gas lessee has an implied right to use the land as reasonably necessary to produce and remove the minerals but must exercise that right with due regard for the landowner's rights.[1] This rule has come to be called the accommodation doctrine. The issue now before us is whether the doctrine also applies as between a landowner and the owner of an interest in the groundwater. Contrary to the court of appeals,[2] we hold that it does, but we agree with that court that the case should be remanded to the trial court for further proceedings.

## I

Coyote Lake Ranch[3] comprises 26,600 acres (a little more than 40 square miles, about one-third the size of the City of Lubbock) in Bailey County, which is in the Texas Panhandle, on the New Mexico border. The Ranch is used primarily for agriculture, raising cattle, and recreational hunting. Most of the Ranch is sand dunes with a natural grass cover, but some of it is irrigated cropland. Water comes from the Ogallala Aquifer, a shallow water table stretching beneath parts of eight states from Texas to South Dakota. The Ogallala is the principal source of water for the Texas High Plains, including the City of Lubbock, which is about 90 miles southeast of the Ranch.[4]

In 1953, during "'the most costly and one of the most devastating droughts in

---

1. *Getty Oil Co. v. Jones,* 470 S.W.2d 618, 621 (Tex.1971).

2. 440 S.W.3d 267 (Tex.App.–Amarillo 2014).

3. The Ranch is owned by Coyote Lake Ranch, LLC.

4. The City also gets water from Lake Alan Henry, about 70 miles to the southeast, and from the Canadian River Municipal Water Authority, which in the past drew from Lake Meredith, but at the time of the temporary injunction hearing, drew from a Roberts County well field just northeast of Amarillo.

600 years' ",[5] the City of Lubbock bought the Ranch's groundwater to help supply its residents and those of other towns. The Ranch deeded its groundwater to the City, reserving water for domestic use, ranching operations, oil and gas production, and ag- ricultural irrigation. For irrigation, the deed allows the Ranch to drill only one or two wells in each of 16 specified areas. The deed contains lengthy, detailed provisions regarding the City's right to use the land, which are set out in full in the margin.[6] Importantly, the deed provides:

**5.** *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 472 (Tex.2012) (quoting Farzad Mashhood, *Current Drought Pales in Comparison with 1950s 'Drought of Record,'* AUSTIN AMERICAN-STATESMAN, Aug. 3, 2011).

**6.** The deed provides:

"[Grantors convey to the City] all of the percolating and underground water in, under, and that may be produced from the hereinafter described tracts of land, situated in Bailey County, Texas, together with the exclusive right to take such water from said tracts of land and to use the same for disposition to cities and towns situated in Bailey, Cochran, Hockley, Lamb and Lubbock Counties, Texas, together with the full and exclusive rights of ingress and egress in, over, and on said lands, so that the Grantee of said water rights may at any time and location drill water wells and test wells on said lands for the purpose of investigating, exploring producing, and getting access to percolating and underground water; together with the rights to string, lay, construct, and maintain water and fuel pipe lines and trunk, collector, and distribution water lines, power lines, communication lines, air vents with barricades, observation wells with barricades, if required, not exceeding ten (10) square feet of surface area, reservoirs, booster stations, houses for employees, and access roads on, over and under said lands necessary or incidental to any of said operations, together with the right to erect necessary housing for wells, equipment and supplies, together with perpetual easements for all such purposes, together with the rights to use all that part of said lands necessary or incidental to the taking of percolating and underground water and the production, treating and transmission of water therefrom and delivery of said water to the water system of the City of Lubbock only; subject to the rights reserved in [Grantors] to such quantities of water as may be required to carry on usual and normal domestic and ranching operations and undertakings upon said lands, excluding irrigation, and such quantities of water as may be required for normal and customary operations for the production of oil and gas and other minerals ... as are now normal and customary in the area where said land is located, and subject also to the exceptions and reservations hereinafter provided....

\* \* \*

"This conveyance is expressly made subject to the rights reserved by [Grantors] ... to drill and use water from one irrigation well for agricultural, irrigation purposes only, such wells to be equipped with one (1) pump having only one column pipe, which pipe shall not exceed ten (10") inches in diameter, to be located on each of the following described [16] tracts of land ..., not more than one well to any one tract [except one section] on which two wells are permitted.

\* \* \*

"In accepting and recording this deed, the City of Lubbock, its successors and assigns, covenants and agrees to pay Three and no/100 ($3.00) Dollars per acre per year for all ground surface occupied by housing facilities, fenced enclosures and roads constructed and used by it and to pay for damages to any surface property proximately caused by any operations or activities on said land by the City of Lubbock, its agents and employees, for which no payment is otherwise provided herein, and shall, within a reasonable time after conducting any operations on said land, remove therefrom any trash, debris and other material or objects which clutter up or detract from the usefulness of said lands to the owners thereof. Where the City of Lubbock, its successors and assigns, constructs new roads through an outside fence, the City of Lubbock shall install and maintain in such opening, gates of durable construction; or, at the option and request of the owner of the land, the City of Lubbock will install and maintain cattle guards. Where the City of Lubbock, its successors and assigns, constructs and uses roads across inside fences, the said City of Lubbock will install and maintain cattle guards; it being understood that locking

- *Well locations:* The City has "the full ... rights of ingress and egress in, over, and on [the Ranch], so that the [City] may at any time and location drill water wells and test wells on said lands for the purpose of investigating, exploring[,] producing, and getting access to percolating and underground water", except that "no city water well shall be drilled ... within one-fourth (1/4th) mile of any of the presently existing windmill wells".

- *Surface use generally:* The City has "the rights to use all that part of [the Ranch] necessary or incidental to the taking[,] production, treating[,] transmission[,] and delivery of ... water".

- *Surface use specifically:* The City—

 - may construct certain specified facilities, including water lines, fuel lines, power lines, communication lines, barricades, and access roads "on, over and under said lands necessary or incidental to any of said operations";

 - must pay rent for the surface occupied;

 - must "pay for damages to any surface property proximately caused by any operations or activities on [the] land by the City"; and

 - must install gates and cattle guards on its roads.

To date, 18 wells have been drilled on the Ranch for irrigation or domestic use, and the City has drilled seven wells on the northern edge of the Ranch.

In 2012, the City announced plans to increase water-extraction efforts on the Ranch, possibly drilling as many as 20 test wells in the middle of the Ranch, followed by 60 additional wells spread across the Ranch. The Ranch objected that the proposed drilling program would increase erosion and injure the surface unnecessarily. The City claimed that it was acting well within the broad rights granted by its deed. Unable to reach agreement, the City began mowing extensive paths through the native grass to prospective drill sites, and the Ranch sued to enjoin the City from proceeding.

The Ranch pleaded in part that the City "has a contractual and common law responsibility to use only that amount of surface that is reasonably necessary to its operations" and "a duty to conduct its operations with due regard for the rights of the surface owner." The City contended that it has full rights under its deed to pursue its plans and that the law imposes no duty on groundwater owners, as it does on mineral owners, to accommodate the surface owner.

At the temporary injunction hearing, the Ranch's manager testified that mowing or removing vegetation from the surface causes destructive wind erosion, exacerbated by cattle tromping over mowed paths. According to the manager, wind, drought, and grazing cattle prevent grass from growing back, particularly in the areas the City mowed—the sandiest, hilliest part of the Ranch. He proposed an alternative plan for different well sites and fewer roads. The Ranch also presented evidence that elevated power lines would allow hawks to roost and prey on the Lesser

gates on the outside fence shall not effect [sic] the right of entry, ingress and egress of authorized officers, employees, and contractors of the City of Lubbock engaged in the business of the City of Lubbock pertaining to the full enjoyment of water rights

herein conveyed. It is expressly understood and agreed that no city water well shall be drilled by the City of Lubbock, its successors or assigns, within one-fourth (1/4th) mile of any of the presently existing windmill wells...."

Prairie Chicken, a threatened species for which the Ranch is a natural habitat.

The trial court granted the Ranch a temporary injunction, concluding

> that the Ranch will probably prevail on the trial of this cause; that pursuit of [the City's] well field plan has caused damaged to the Ranch, and further damage to the Ranch will occur absent the use of reasonable means to ameliorate that damage; that [the City's] proposed well field plan is likely accomplished through reasonable alternative means that do not unreasonably interfere with the Ranch's current uses; and that the Ranch has suffered harm caused by [the City's] activities and will likely suffer irreparable harm in the future.

The court enjoined the City from

a. Mowing, blading, or otherwise destroying the growing grass on the surface of the Ranch;

b. Proceeding with any test hole drilling or water well drilling without consulting plaintiff regarding potential impacts to the surface of the Ranch;

c. Erecting power lines to proposed well fields on the Ranch.

The City appealed,[7] arguing that its deed expressly gives it the right to conduct the proposed operations, and that the restrictions on mineral owners imposed by the common law—the accommodation doctrine—do not apply to groundwater owners. The court of appeals appears simply to have assumed that the deed provisions are as broad as the City contends, concluding that the Ranch could not prevail unless the accommodation doctrine applies.[8] The Ranch argued that this Court's decision in *Edwards Aquifer Authority v. Day* [9] supports an extension of the doctrine. In *Day*, we held that groundwater is owned in place by the landowner, in part analogizing to oil and gas, which we have long held is owned in place by the landowner.[10] By the same reasoning, the Ranch argued, the accommodation doctrine should extend to groundwater interests. The court of appeals rejected the argument, and finding no authority to support the Ranch's position, reversed and dissolved the temporary injunction.[11]

We granted the Ranch's petition for review.[12]

---

7. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(4).

8. 440 S.W.3d 267, 272, 273 n. 2 (Tex.App.–Amarillo 2014).

9. 369 S.W.3d 814 (Tex.2012).

10. *Id.* at 823 ("Whether groundwater can be owned in place is an issue we have never decided. But we held long ago that oil and gas are owned in place, and we find no reason to treat groundwater differently."); *id.* at 831 ("[T]he issue is not whether there are important differences between groundwater and hydrocarbons; there certainly are. But we see no basis in these differences to conclude that the common law allows ownership of oil and gas in place but not groundwater.").

11. 440 S.W.3d at 273–274.

12. 58 Tex.Sup.Ct.J. 1600 (Sept. 4, 2015). We have limited jurisdiction over temporary injunction and other interlocutory appeals. TEX. GOV'T CODE § 22.225(b)(3), (4). We have "conflicts" jurisdiction over an interlocutory appeal when "one of the courts of appeals holds differently from a prior decision of another court of appeals or of the supreme court"—that is, "when there is inconsistency in their respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants." *Id.* § 22.225(c), (e). The Legislature added the quoted definition for "holds differently" in 2003, Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 1.04, 2003 Tex. Gen. Laws 847, 849–850 [HB 4], rejecting the restricted view of "conflicts jurisdiction" the Court had taken previously. *Compare City of San Antonio v. Ytuarte*, 229 S.W.3d 318, 319 (Tex.2007) (per curiam) ("In 2003, the Legislature redefined

## II

"As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy."[13] The rule applies to a mineral owner's use of land,[14] and the Ranch and the City agree that it applies to them as well. The City's deed governs its use of the Ranch's land to access and remove groundwater.

The deed gives the City the right to drill wells "at any time and location" but only "for the purpose of" conducting operations to access the groundwater.[15] The deed then limits the City's use of the Ranch to what is "necessary or incidental" to those operations. But the deed leaves unclear whether the City can do everything necessary or incidental to drilling anywhere, as it claims, or only what is necessary or incidental to fully access the groundwater, as the Ranch argues. If the City is correct, it has an all but absolute right to use the surface heedless of avoidable injury, although it must answer for damages caused to the surface and rent incurred for the surface occupied. The City contends that it can drill wherever it chooses, even if it could drill in places less damaging to the surface and still access all the water. If the Ranch is correct, the City can drill only where the Ranch allows as long as full access to the groundwater is not impaired. The Ranch could thus severely restrict the City's drilling activities. The deed does not resolve this dispute. It is simply silent on the subject.

The same is true for the Ranch's complaint that overhead power lines will unnecessarily threaten the Lesser Prairie Chicken habitat on the Ranch. Given the City's concerns that buried power lines are more expensive and possibly problematic in shifting sand dunes, overhead power lines are necessary or incidental to the City's plan. But if the Ranch's environmental concern were equally important to the City, buried power lines would be necessary or incidental to its plan. The "necessary or incidental" standard may prohibit a merely wasteful use of the surface, but it does not resolve the disagreement between the Ranch and the City.

We thus disagree with the City that the deed provisions alone determine its rights

and broadened our conflicts jurisdiction to eliminate the previous requirement[s]" imposed by the Court.), *with Collins v. Ison–Newsome,* 73 S.W.3d 178, 181 (Tex.2001) (restating the Court's strict test for "conflicts jurisdiction"); *see also id.* at 193 (Hecht, J., dissenting) ("Confusion, and waste, which 'conflicts jurisdiction' is designed to avoid, are the hallmarks of the Court's 'conflicts jurisdiction' jurisprudence. 'Conflicts jurisdiction', in the Court's hands, is not a functional tool for resolving conflicts in the law but a contorted choreography for dancing around them."). The broadened standard requires a realistic and functional approach to "conflicts jurisdiction". As we will explain, the court of appeals' refusal to extend to groundwater owners the accommodation doctrine long applicable to mineral owners is fundamentally inconsistent with our analysis in *Day* concluding that the similarities between groundwater and minerals require consistent rules of ownership. While this is in a sense a case of first impression, our decision is based on principles set out in *Day* and other cases, eliminates unnecessary uncertainty in the law, and provides direction to the parties before us and others with similar issues.

**13.** *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 129 (Tex.2004).

**14.** *See Sun Oil Co. v. Whitaker,* 483 S.W.2d 808, 810–811 (Tex.1972); *see also DeWitt Cty. Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 105 (Tex.1999) (explaining that parties can displace common law rules by contract).

**15.** As noted above, there is an exception; the City cannot drill within a quarter mile of existing wells.

to use the Ranch.[16] Accordingly, we turn to the question whether the accommodation doctrine should apply.

## III

Texas law has always recognized that a landowner may sever the mineral and surface estates and convey them separately.[17] The severed mineral estate has the implied right to use as much of the surface estate as reasonably necessary to produce and remove minerals.[18] As far back as 1862, we declared that this right was a "well established doctrine from the earliest days of the common law" and civil law.[19] The right is born of a simple logic: "a grant or reservation of minerals would be wholly worthless if the grantee or reserver could not enter upon the land in order to explore for and extract the minerals granted or reserved."[20] In the law of servitudes, the mineral estate is called "dominant" and the surface estate "servient", not because the mineral estate is in some sense superior, but because it receives the benefit of the implied right of use of the surface estate.[21]

The mineral and surface estates must exercise their respective rights with due regard for the other's.[22] This princi-

16. Our other accommodation doctrine cases involved deed or lease language which similarly failed to resolve the surface-use dispute between the surface and mineral estates. *See, e.g., Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244 (Tex.2013) (interpreting lease which granted mineral estate the "exclusive right of exploring, drilling, mining and operating for, producing and owning oil, gas, sulphur and all other minerals ... together with the right to ... construct roads and bridges, dig canals, build tanks, power stations, telephone lines, employee houses and other structures on said land, *necessary or useful* in lessee's operations ...." (emphasis added)).

17. In Texas, the right to sever the mineral estate originates in Spanish law, which recognized that "a property may be acquired in mines which will be quite independent of the property in the lands in which they are situated." *Cowan v. Hardeman*, 26 Tex. 217, 223 (1862) (quoting JOHN A. ROCKWELL, A COMPILATION OF SPANISH AND MEXICAN LAW, IN RELATION TO MINES, AND TITLES TO REAL ESTATE, IN FORCE IN CALIFORNIA, TEXAS AND NEW MEXICO 580 (New York, John S. Voorhies 1851)). The severance of all minerals in Texas began with an 18th century Spanish royal decree which declared all minerals and mines in the "new Spain" property of the throne. *See* WALACE HAWKINS, EL SAL DEL RAY 7–15 (Austin, Tex. State Historical Ass'n 1947) (providing a detailed history of the royal mining ordinances and their impact on the development of Texas mineral law).

18. *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 788 (Tex.1995); *Acker v. Guinn*, 464 S.W.2d 348, 352 (Tex.1971); *Humble Oil & Refining Co. v. Williams*, 420 S.W.2d 133, 134 (Tex.1967).

19. *Cowan*, 26 Tex. at 222.

20. *Harris v. Currie*, 142 Tex. 93, 176 S.W.2d 302, 305 (1943).

21. *See* RESTATEMENT (THIRD) OF PROP.: SERVITUDES § 1.1(1) (AM. LAW INST. 1998) ("A servitude is a legal device that creates a right or an obligation that runs with land or an interest in land. (a) Running with land means that the right or obligation passes automatically to successive owners or occupiers of the land or the interest in land with which the right or obligation runs. (b) A right that runs with land is called a 'benefit' and the interest in land with which it runs may be called the 'benefited' or 'dominant' estate. (c) An obligation that runs with land is called a 'burden' and the interest in land with which it runs may be called the 'burdened' or 'servient' estate.").

22. *Acker*, 464 S.W.2d at 352 ("[The mineral] estate is dominant, of course, and its owner is entitled to make reasonable use of the surface for the production of his minerals. It is not ordinarily contemplated, however, that the utility of the surface for agricultural or grazing purposes will be destroyed or substantially impaired. Unless the contrary intention is affirmatively and fairly expressed, therefore, a grant or reservation of 'minerals' or 'mineral rights' should not be construed to include a

ple underlies the accommodation doctrine, which we announced in 1971 in Getty Oil Co. v. Jones.[23] Jones, the surface estate owner, sued to enjoin the mineral estate owner, Getty Oil, from erecting oil-well pumpjacks in the path of several center-pivot irrigation systems already in place on his farm, thus preventing their use.[24] Jones argued that Getty Oil should be required to bury the pumpjacks or use smaller hydraulic pumps that would not obstruct the irrigation systems.[25] In response, Getty Oil argued that it had the right under its lease and as owner of the dominant estate to set the pumpjacks where it chose.[26] We held that

> [W]here there is an existing use by the surface owner which would otherwise be precluded or impaired, and where under the established practices in the industry there are alternatives available to the lessee whereby the minerals can be recovered, the rules of reasonable usage of

the surface may require the adoption of an alternative by the lessee.[27]

"Under such circumstances", we said, "the right of the surface owner to an accommodation between the two estates may be shown".[28] The burden is on the surface owner to prove that the mineral estate's use of the surface is not reasonably necessary.[29] The alternatives available to the mineral estate must be considered with "regard to the surface uses otherwise available to the surface owner", and the availability of reasonable alternatives to the surface owner is the "proper initial inquiry".[30]

Jones's irrigation system afforded "the most advantageous, and perhaps the only reasonable means of developing the surface for agricultural purposes."[31] Getty, on the other hand, could use "two types of pumping installations ... which are reasonable alternatives to its present use of the surface".[32] Jones, we concluded, was entitled to injunctive relief.[33]

substance that must be removed by methods that will, in effect, consume or deplete the surface estate."); *Brown v. Lundell*, 162 Tex. 84, 344 S.W.2d 863, 866 (1961); *Warren Petrol. Corp. v. Martin*, 153 Tex. 465, 271 S.W.2d 410, 413 (1954) ("Of course each [that is, the surface estate and the mineral estate] must exercise their respective rights of state with due regard for the rights of the other." (citing *Gulf Prod. Co. v. Continental Oil Co.*, 139 Tex. 183, 132 S.W.2d 553, 562 (1939), *opinion withdrawn on reh'g*, 139 Tex. 183, 164 S.W.2d 488 (1942)).

23. 470 S.W.2d 618 (Tex.1971).

24. *Id.* at 619.

25. *Id.* at 621.

26. *Id.* at 620–621. Getty Oil's lease, which was in effect before Jones purchased the surface estate, granted Getty Oil access to the surface "for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building roads, tanks, power

stations, telephone lines, houses for its employees, and other structures thereon to produce, save, take care of, treat, transport, and own said products." *Id.*

27. *Id.* at 622.

28. *Id.* at 623.

29. *Id. See also Humble Oil & Refining*, 420 S.W.2d at 134 (explaining that under the principle of due regard "[a] person who seeks to recover from the lessee for damages to the surface has the burden of alleging and proving either specific acts of negligence or that more of the land was used by the lessee than was reasonably necessary").

30. *Getty Oil Co.*, 470 S.W.2d at 627–628 (op. on reh'g).

31. *Id.* at 622.

32. *Id.*

33. *Id.* at 623.

The next year, in *Sun Oil Co. v. Whitaker*, we observed that the accommodation doctrine has broad application:

> A definite trend toward conciliation of conflicts and accommodation of both estates is evident in our court decisions and in the conduct between the lessees and surface owners. . . . This Court has led the way in working out accommodations which preserve unto the severed mineral owner or lessee a reasonable dominant easement for the production of his minerals while at the same time preserving a viable servient estate.[34]

Two years later, in *Humble Oil & Refining Co. v. West*, we applied the doctrine in a different situation.[35] The Wests had conveyed their land in fee simple to Humble Oil, reserving a royalty on the gas produced.[36] As the reservoir neared depletion, Humble Oil decided to use it to store gas produced elsewhere.[37] The case again presented, we said,

> the recurring problem of adjusting correlative rights. The factual context is unique and there is no directly controlling precedent; however, this Court has led the way in conciliating conflicts between owners of the surface and of the mineral rights, and in requiring reasonable accommodations between them.[38]

We remanded the case to the trial court to determine whether the volume of native gas on which the Wests were entitled to a royalty could be established with reasonable certainty, thus balancing their right to a full profit with Humble's right to preserve the storage capability of the reservoir.[39]

In 1993, in *Tarrant County Water Control and Improvement District No. One v. Haupt, Inc.*, we held that the doctrine applied to a government entity that had acquired the surface estate through condemnation.[40] Three years ago, in *Merriman v. XTO Energy, Inc.*, we restated the elements that must be proved to obtain relief:

> To obtain relief on a claim that the mineral lessee has failed to accommodate an existing use of the surface, the surface owner has the burden to prove that (1) the lessee's use completely precludes or substantially impairs the existing use, and (2) there is no reasonable alternative method available to the surface owner by which the existing use can be continued. If the surface owner carries that burden, he must further prove that given the particular circumstances, there are alternative reasonable, customary, and industry-accepted methods available to the lessee which will allow recovery of the minerals and also allow the surface owner to continue the existing use.[41]

"The issue", we said, "is one of fairness to both parties in light of the particular existing use by the surface owner and the principle underlying the accommodation doctrine: balancing the rights of surface and mineral owners to use their respective estates while recognizing and respecting

---

34. 483 S.W.2d 808, 817 (Tex.1972).

35. 508 S.W.2d 812 (Tex.1974).

36. *Id.* at 813.

37. *Id.*

38. *Id.* at 815 (citing *Sun Oil Co.*, 483 S.W.2d at 808; *Acker*, 464 S.W.2d 348; *Getty Oil Co.*, 470 S.W.2d 618).

39. *Id.* at 816, 819.

40. 854 S.W.2d 909, 911–912 (Tex.1993).

41. 407 S.W.3d 244, 249 (Tex.2013) (internal citations omitted).

the dominant nature of the mineral estate." [42]

## IV

The accommodation doctrine, based on the principle that conflicting estates should act with due regard for each other's rights, has provided a sound and workable basis for resolving conflicts between ownership interests. The paucity of reported cases applying the doctrine suggests that it is well-understood and not often disputed. We have applied the doctrine only when mineral interests are involved. But similarities between mineral and groundwater estates, as well as in their conflicts with surface estates, persuade us to extend the accommodation doctrine to groundwater interests.

Groundwater and minerals both exist in subterranean reservoirs in which they are fugacious. An interest in groundwater can be severed from the land as a separate estate,[43] just as an interest in minerals can be.[44] A severed groundwater estate has the same right to use the surface [45] that a severed mineral estate does.[46] Both groundwater [47] and mineral estates are subject to the rule of capture.[48] And both are protected from waste.[49] These similarities led us to hold in *Edwards Aquifer Authority v. Day* that groundwater, like oil and gas, is owned by the landowner in place below the surface.[50] We acknowledged the important difference between water and hydrocarbons: water is an "often ... renewable", "life-sustaining" re-

42. *Id.* at 250.

43. *Evans v. Ropte,* 128 Tex. 75, 96 S.W.2d 973, 974 (1936) ("It seems to be almost universally recognized that a right created by a grant to enter upon land and take and appropriate the waters of a spring or well thereon amounts to an interest in real estate, regardless of the term by which such right may be designated. In some states it is held to be an easement, but in other cases it is held to be more than an easement. In all events, it is an interest in land."); *Texas Co. v. Burkett,* 117 Tex. 16, 296 S.W. 273, 278 (Tex.1927) ("[T]he presumption is that the sources of water supply obtained by such excavations are ordinary percolating waters, which are the exclusive property of the owner of the surface of the soil, and subject to barter and sale as any other species of property.").

44. *Supra* note 17.

45. *Evans,* 96 S.W.2d at 974 ("[T]he sale of mineral waters in the land to the mutual benefit of all parties, ... grants by necessary implication, if not by express words, the right to enter upon the land and take and appropriate the mineral waters within same, and to do everything necessary and appropriate for the accomplishment of that purpose.").

46. *Supra* note 18.

47. *Sipriano v. Great Spring Waters of Am., Inc.,* 1 S.W.3d 75, 76 (Tex.1999); *Houston & T.C. Ry. Co. v. East,* 98 Tex. 146, 81 S.W. 279, 281 (1904) (citing *Acton v. Blundell,* 152 Eng. Rep. 1223, 1235 (Ex. Ch. 1843)).

48. *Stephens Cty. v. Mid-Kansas Oil & Gas Co.,* 113 Tex. 160, 254 S.W. 290, 292 (1923) ("If the owners of adjacent lands have the right to appropriate, without liability, the gas and oil underlying their neighbor's land, then their neighbor has the correlative right to appropriate, through like methods of drainage, the gas and oil underlying the tracts adjacent to his own." (citing *East,* 81 S.W. at 279)); *see also Coastal Oil & Gas Corp. v. Garza Energy Trust,* 268 S.W.3d 1, 13 (Tex.2008) (explaining that the rule of capture "gives a mineral rights owner title to the oil and gas produced from a lawful well bottomed on the property, even if the oil and gas flowed to the well from beneath another owner's tract" (citing *Stephens Cty.,* 254 S.W. at 292; *East,* 81 S.W. at 280)).

49. *See, e.g., Sipriano,* 1 S.W.3d at 76 (recognizing the rule of capture and allowing suit for wasteful drainage of groundwater); *Elliff v. Texon Drilling Co.,* 146 Tex. 575, 210 S.W.2d 558, 562–563 (1948) (recognizing the rule of capture and allowing suit for wasteful drainage of oil and gas).

50. 369 S.W.3d 814, 829–832 (Tex.2012).

source used "for drinking[,] recreation, agriculture, and the environment", while oil and gas are "essentially non-renewable ... commodit[ies] for energy and in manufacturing".[51] But we saw "no basis in these differences to conclude that the common law allows ownership of oil and gas in place but not groundwater." [52]

Analogizing groundwater to minerals in determining the applicability of the accommodation doctrine is no less valid than it is in determining ownership. Common law rules governing mineral and groundwater estates are not merely similar; they are drawn from each other or from the same source. The dispute here over the City's right to use the Ranch is much the same as the disagreement between Getty Oil and Jones. Resolution of both requires an interpretation of the severed estate's implied right to use the surface. The accommodation doctrine has proved its worth in such cases.

Nevertheless, the City argues that the doctrine should not extend to groundwater estates. For one thing, the City argues, a groundwater estate has never been held to be dominant, as a mineral estate is. But as we have noted, "dominant" in the law of servitudes means only benefitted, not superior.[53] Though we have not used the word to describe a severed groundwater estate, the estate is dominant for the same reason a mineral estate is; it is benefitted by an implied right to the reasonable use of the surface. The surface estate is not servient because it is lesser or inferior but because it must allow the exercise of that implied right. The City further argues that the better rule would be to imply

terms, such as a requirement of reasonable use, into its deed to resolve the dispute.[54] But the City already has the implied right to a reasonable use of the surface, as well as the express right to do what is necessary or incidental to taking water. What is reasonable, necessary, or incidental for the severed estate cannot be determined in the abstract but must be measured against, and with due regard for, the rights of the surface estate. That is the accommodation doctrine, and we are reluctant to search for a new approach to resolving disputes over a severed estate's implied right to reasonable use of the surface when a proven rule is at hand. The City argues that applying the accommodation doctrine would be a "momentous" change in groundwater law. But the City has not suggested how the doctrine would resolve conflicts like this one any differently than another approach.

■ Accordingly, we hold that the accommodation doctrine applies to resolve conflicts between a severed groundwater estate and the surface estate that are not governed by the express terms of the parties' agreement. As stated in *Merriman*, the surface owner must prove that (1) the groundwater owner's use of the surface completely precludes or substantially impairs the existing use, (2) the surface owner has no available, reasonable alternative to continue the existing use, and (3) given the particular circumstances, the groundwater owner has available reasonable, customary, and industry-accepted methods to access and produce the water and allow

---

51. *Id.* at 831.

52. *Id.*

53. *Supra* note 21.

54. *See* RESTATEMENT (SECOND) OF CONTRACTS § 204 (AM. LAW INST. 1981) ("When the parties

to a bargain ... have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.").

continuation of the surface owner's existing use.[55]

## V

The trial court's temporary injunction prohibits the City from all mowing, blading, or destroying grass on the Ranch. The Ranch concedes that this operates as a de facto moratorium on any surface activity by the City. Rather than preserve the status quo, which is its proper function,[56] the temporary injunction denies the City its undisputed right to access groundwater. The temporary injunction also prohibits the City from erecting power lines, even though its deed gives it the express right to do so. While the Ranch has argued that some power lines may threaten the Lesser Prairie Chicken, it has not shown that all power lines would do so. Finally, the temporary injunction requires the City to consult with the Ranch before any further drilling. While consultation might produce agreement between the parties, an injunction requiring it is not justified by the record.

█ The Ranch argues that the injunction is an appropriate means of stopping the City's improper use of the surface pending a final resolution of the dispute. But an injunction "so broad as to enjoin a defendant from activities which are a lawful and proper exercise of his rights" is an abuse of discretion.[57] The court of appeals was correct in reversing the trial court's order and remanding the case for further proceedings. But those proceedings must be consistent with today's opinion.

\* \* \* \* \*

The principle, absent an agreement to the contrary, that a severed mineral estate's implied right to use the surface must be exercised with due regard for the surface estate's rights, and the rules common to mineral and groundwater estates, compel the conclusion that the accommodation doctrine extends to groundwater estates. For this reason, the court of appeals' judgment reversing the temporary injunction and remanding the case for further proceedings is

Affirmed.

JUSTICE BOYD filed a concurring opinion, in which JUSTICE WILLETT and JUSTICE LEHRMANN joined.

JUSTICE BOYD, joined by JUSTICE WILLETT and JUSTICE LEHRMANN, concurring.

"Absent an agreement to the contrary, an oil-and-gas lessee has an implied right to use the land as reasonably necessary to produce and remove the minerals but must exercise that right with due regard for the landowner's rights." *Ante* at 55. This is the common-law "accommodation doctrine," and it is a well-established tenet of our oil-and-gas jurisprudence. *See Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 249 (Tex.2013); *Tarrant Cty. Water Control & Imp. Dist. No. One v. Haupt, Inc.*, 854 S.W.2d 909, 911 (Tex.1993); *Getty Oil Co. v. Jones*, 470 S.W.2d 618, 621 (Tex. 1971). Addressing an issue of first impression, the Court announces in this case that the "similarities between mineral and groundwater estates, as well as in their

**55.** *See Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 249 (Tex.2013). The City questions whether the accommodation doctrine is workable when both the minerals and the groundwater have been severed from the land. We leave that issue for another day.

**56.** *Matlock v. Data Processing Sec., Inc.*, 618 S.W.2d 327, 328 (Tex.1981).

**57.** *Holubec v. Brandenberger*, 111 S.W.3d 32, 39–40 (Tex.2003) (citing *Villalobos v. Holguin*, 146 Tex. 474, 208 S.W.2d 871, 875 (1948)).

conflicts with surface estates, persuade us to extend the accommodation doctrine to groundwater interests." *Ante* at 63. The Court thus holds "that the accommodation doctrine applies to resolve conflicts between a severed groundwater estate and the surface estate that are not governed by the express terms of the parties' agreement." *Ante* at 64.

I agree, but the key to the Court's holding is that the accommodation doctrine only applies to groundwater rights—just as it only applies to mineral rights—when the parties' dispute is "not governed by the express terms of the parties' agreement." *Ante* at 64. When the parties' agreement expressly addresses the dispute, it is unnecessary and improper for courts to imply rights and obligations through the accommodation doctrine. As the Court explains, the "parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy," and this rule "applies to a mineral owner's use of land." *Ante* at 59.[1] When a lease or deed expressly describes the disputed rights, "we may neither rewrite the parties' contract nor add to its language." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex.2003).

In this case, I conclude that the parties' primary dispute is "governed by the express terms of" the deed through which the City obtained its groundwater rights. In that deed, the Ranch expressly conveyed to the City not only the right to the "water in, under and that may be produced from" the land, and the "exclusive right to take such water from said tracts of land," but also:

- "the full and exclusive rights of ingress and egress in, over, and on said lands, so that the [City] may *at any time and location drill water wells and test wells* on said lands for the purpose of investigating, exploring, producing, and getting access to percolating and underground water;"

- "the rights to string, lay, construct, and maintain water and fuel pipe lines and trunk, collector, and distribution water lines, power lines, communication lines, air vents with barricades, observation wells with the barricades, if required, not exceeding ten (10) square feet of surface area, reservoirs, booster stations, houses for employees, *and access roads on, over and under said lands necessary or incidental* to any of said operations"; and

- "the rights *to use all that part of said lands necessary or incidental* to the taking of percolating and underground water and the production, treating and transmission of water therefrom...."

(Emphases added.)

Exercising these rights, the City developed a plan to draw substantially more water by drilling up to eighty additional wells in various locations. After the City selected the well sites and began mowing

---

1. *See Sun Oil Co. v. Whitaker*, 483 S.W.2d 808, 811 (Tex.1972) ("The rights implied from the grant are implied by law in all conveyances of the mineral estate and, absent an express limitation thereon, are not to be altered by evidence that the parties to a particular instrument of conveyance did not intend the legal consequences of the grant."); *Getty Oil*, 470 S.W.2d at 621 (applying accommodation doctrine to resolve complaint about lessee's use of tall oil pumps because the "lease contains no specific provision concerning the vertical usage of the land"); *Humble Oil & Ref. Co. v. Williams*, 420 S.W.2d 133, 134–35 (Tex.1967) (applying accommodation doctrine because lease agreement lacked any provision requiring lessee to "pay for damages to land, trees[,] and cattle, and that such provisions are enforceable whether [or] not the damage or destruction is occasioned by a reasonable use of the land").

paths to access those sites, the Ranch filed suit and obtained a temporary injunction prohibiting the City from drilling any wells without first consulting the Ranch, mowing or otherwise destroying the native grass, and erecting power lines to the proposed well sites. The court of appeals reversed the temporary injunction, holding that the accommodation doctrine does not apply to groundwater leases and that the deed expressly permits the City to engage in the activities that the injunction prohibits. 440 S.W.3d 267, 272–73 (Tex.App.–Amarillo 2014).

The Court affirms, but it concludes that the accommodation doctrine applies in this case because the deed is "simply silent" on the parties' disagreement and "does not resolve this dispute" or "determine [the City's] rights to use the Ranch." *Ante* at 59. In the Court's view, "the deed leaves unclear whether the City can do everything necessary or incidental to drilling anywhere, as it claims, or only what is necessary or incidental to fully access the groundwater, as the Ranch argues." *Ante* at 59.

I disagree. The Ranch's position is that the accommodation doctrine requires the City to adopt "an alternative plan for different well sites and fewer roads." *Ante* at 57. The deed, however, expressly grants the City the right to drill water wells "at any time and location . . . for the purpose of" accessing the groundwater. If the City chooses to drill sixty new water wells, the deed expressly grants the City that right. And if the City chooses to drill those wells where native grass grows on sand dunes, the deed expressly grants the City that right. Because the express terms of the parties' agreement address the issue, the accommodation doctrine does not apply and the Ranch cannot rely on the doctrine to require the City to adopt an alternative plan for different well sites.

I do agree, however, that the accommodation doctrine may apply to the issue of where and how the City can construct access roads, as opposed to the issue of where it may locate wells. Although the deed grants the City the right to drill wells anywhere and at any time, it permits the City to construct access roads and other improvements only as "necessary or incidental" to its operations and to otherwise use the land only as "necessary or incidental" to taking water at those sites. Because phrases like "necessary or incidental," "necessary or useful," and "necessary and convenient" leave substantial room for disagreement, we have applied the accommodation doctrine to inform their meanings by imposing a reasonableness standard on the uses the agreements permit. *See, e.g., Merriman,* 407 S.W.3d at 249 (applying the accommodation doctrine to a lease that permitted the lessee to use the surface as necessary or useful in its operations); *Moser v. U.S. Steel Corp.,* 676 S.W.2d 99, 100, 103 (Tex.1984) (applying the accommodation doctrine when deed conveyed "all necessary and convenient easements for the purpose of" the mineral estate).

Thus, to the extent the Ranch contends that the City's paths, roads, and power lines are not "necessary or incidental" to the taking of water from the well sites the City has selected, I agree that the trial court should apply the accommodation doctrine on remand to resolve that issue. But to the extent that the Ranch seeks to require the City to select different or fewer well sites, the accommodation doctrine does not apply because the deed expressly grants the City the right to drill water wells "at any time and location."