

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| CACTUS WATER SERVICES, LLC, | § | No. 08-22-00037-CV |
| Appellant, | § | Appeal from the |
| v. | § | 143rd District Court |
| COG OPERATING, LLC, | § | of Reeves County, Texas |
| Appellee. | § | Cause No. 20-03-23456-CVR |

**DISSENTING OPINION**

Water—unsevered by express conveyance or reservation—has long been held a part of the surface estate. *Robinson v. Robbins Petroleum Corp.*, 501 S.W.2d 865, 867 (Tex. 1973) ("[T]he water itself is an incident of surface ownership in the absence of specific conveyancing language to the contrary."). But it is also long recognized that the surface estate must accommodate the reasonable use of the water as is necessary to effectuate the purpose of an oil and gas lease. *See Sun Oil Co. v. Whitaker*, 483 S.W.2d 808, 811 (Tex. 1972). These principles of oil and gas jurisprudence are fundamental. Yet, by its decision, the majority reaches a result that upends this balancing of competing rights and responsibilities. Here, the Court holds that water produced from an oil and gas well is owned not by the surface estate but rather by the oil-and-gas lessee. This result bears out even though no conveyance is expressed by the terms of the oil and gas leases.

Standing apart from the majority, I disagree. Based on the express language of the leases, I would interpret the granting language as conveying oil, gas, and hydrocarbons produced from the Leased Land, but not the water incidentally recovered from the subsurface, from which oil and gas has been removed. Because the majority concludes otherwise, I respectfully dissent.

## I. OIL, GAS, AND GROUNDWATER

The parties agree that COG was conveyed the mineral estate of the Leased Lands based on the subject oil-and-gas leases. By the granting clause of the four oil and gas leases, COG is conveyed "oil and gas and other hydrocarbons," or, more narrowly, only "oil and gas," as stated in the more recent leases. The parties here place no importance on that wording variation. Over time, and by assignment, Cactus later acquired an interest in the produced water of the surface estate. At present, the conflict centers on whether the oil-and-gas leases at issue conveyed to COG all the water produced from their oil-and-gas wells, or whether Cactus maintains ownership of all produced water that remains after COG's reasonable use.

## A. Principles of Lease Construction

The proper construction of an unambiguous lease is a question of law determined de novo. *Samson Explor., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 787 (Tex. 2017). "An unambiguous contract—one whose meaning is certain and definite—will be enforced as written." *Blue Stone Nat. Res. II, LLC v. Randle*, 620 S.W.3d 380, 387 (Tex. 2021). Here, although the parties differ in their interpretation of the oil and gas leases, neither of them assert the leases are ambiguous. Also, ambiguity does not arise merely because the parties assert differing interpretations. *N. Shore Energy, LLC v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016).

The rules and principles generally applied in contract interpretation are also used to construe oil-and-gas leases. *Endeavor Energy Res., LP v. Discovery Operating, Inc.*, 554 S.W.3d

2

586, 595 (Tex. 2018). Unless a lease is ambiguous, our primary duty is "to ascertain the intent of the parties from all of the language within the four corners" of the lease. *See Wenske v. Ealy*, 521 S.W.3d 791, 794 (Tex. 2017). "This analysis begins with the [lease's] express language." *Murphy Explor. & Prod. Co.—USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018). "We give the lease's language its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions." *Apache Deepwater, LLC v. Double Eagle Dev., LLC*, 557 S.W.3d 650, 654 (Tex. App.—El Paso 2017, pet. denied) (citing *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966)). "We presume the parties intended every clause to have some effect, so we 'examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent.'" *Endeavor Energy*, 554 S.W.3d at 595 (quoting *Anadarko Petrol. Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)).

Texas has long recognized a strong public policy favoring the freedom to contract, and we are compelled to "respect and enforce" the parties' agreements. *See id.*, 554 S.W.3d at 595. "Absent compelling reasons, courts must respect and enforce the terms of a contract the parties have freely and voluntarily entered[.]" *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481 (Tex. 2017). Along these lines, parties have the right to contract as they see fit so long as their agreement does not violate the law or public policy. *Id.* at 481.

Having laid this legal framework, I turn to how I would interpret the leases at issue.

## B. Analysis

### 1. The Leases

In my view, the majority's reading of the parties' disagreement as "whether 'produced water' is, as a matter of law, water or if it is waste," mistakenly presumes the leases transferred ownership of produced water to COG. I believe the ultimate issue is whether the entire "product

3

stream" (of which produced water is only a part),[1] is conveyed by a granting clause that merely conveys "oil and gas." And even though COG's claim encompasses the entire "oil and gas product stream," Cactus's competing claim seeks the produced water remaining only after conveyed substances have already been removed. To resolve these claims, I would start with the leases' granting clauses.

Textually, neither water (in any form) nor oil and gas waste, for that matter, is mentioned in any of the lease language. For example, the term, "produced water," does not appear anywhere in the four oil and gas leases. Other than certain limitations on its use and provisions prohibiting contamination of both the surface and the subsurface, "water" is also not mentioned in the leases. Likewise, the term "waste" also does not appear in the lease terms. Keeping the language in mind, the Supreme Court of Texas has long addressed the proper interpretation of lease terms.

One of a property owner's core rights is the right to transfer property—in the case of real property, a legal unit of ownership called an "estate." *See Evanston Inc. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 383 (Tex. 2012) (listing core rights in a property owner's bundle of rights); *City of Baytown v. Schrock*, 645 S.W.3d 174, 179 (Tex. 2022) (the right to privately own real property is a fundamental right); *Averyt v. Grande, Inc.*, 717 S.W.2d 891, 894 (Tex. 1986) (an estate is "a legal unit of ownership in the physical land"). "[A] landowner may sever the mineral and surface estates and convey them separately." *Coyote Lake Ranch, LLC v. City of Lubbock*, 498 S.W.3d 53, 60 (Tex. 2016). And with respect to water, the surface estate owner, who owns all groundwater in place beneath the surface of the land, can sever and convey an interest in the groundwater similar

---

[1] Even the use of the term "product stream" presupposes that everything coming from the well is a product. For lack of a better term, I will refer to the totality of substances that come from the well bore as the "product stream," but in my view, water is not a product under the oil and gas leases.

4

to such severing of a mineral interest. *See Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 831 (Tex. 2012); *see also Coyote Lake Ranch*, 498 S.W.3d at 63.

The severance of a mineral estate is typically accomplished by granting or reserving "oil, gas and other minerals." *Moser v. U.S. Steel Corp.*, 676 S.W.2d 99, 101 (Tex. 1984). And here, the leases' granting clauses are narrowly stated, merely including "oil and gas," or, "oil, gas, and other hydrocarbons." This language contrasts with the commonly used phrase of "oil, gas, and other minerals." The narrowing of the substances being conveyed certainly may be a response to cases interpreting lease language. In *Moser*, for example, the Supreme Court of Texas confirmed that only certain substances are impliedly conveyed or reserved by the use of the phrase, "other minerals." *Id. Moser* confirmed that water remains a part of the surface estate and is not conveyed by the terms, "oil, gas and other minerals." *Id*. (citing *Sun Oil*, 483 S.W.2d at 811).

In that context, as expressed by lease language, water is not "a thing of like kind to oil and gas." *Fleming Found. v. Texaco, Inc.*, 337 S.W.2d 846, 852 (Tex. App.—Amarillo 1960, writ ref'd n.r.e.). It follows, then, that a grant of "oil, gas and other minerals" does not include a conveyance of water. To be sure, unless water (or subsurface water) is expressly reserved or conveyed, it remains an unsevered part of the surface estate. *Sun Oil Co.*, 483 S.W.2d at 811; *Pfluger v. Clack*, 897 S.W.2d 956, 959 (Tex. App.—Eastland 1995, writ denied); *Fleming Foundation*, 337 S.W.2d at 852. Based on these authorities, I would conclude the oil and gas leases at issue here do not expressly convey water in any form. But even so, as *Sun Oil* clarified, the mineral estate owner may use the water to the extent reasonably necessary for the production of its minerals. *Sun Oil*, 483 S.W.2d at 810 ("Sun has the implied right to free use of so much of the water in question as may be reasonably necessary to produce the oil from its oil wells.").

5

Here, this conclusion—that water was not included with the oil-and-gas estate—harmonizes the granting clause of the leases with further restrictions included by other language. That is, paragraph 18 of the Collier leases limits COG's use of water "on or under" the Leased Lands to drilling a water well for use in its operations. If all of the subsurface water had been granted to COG, there would be no need to include such limiting provision. *See Endeavor Energy*, 554 S.W.3d at 595.

In addition to looking at the leases, the majority cites the ancillary surface use and right-of-way agreements between COG and the surface owners, which COG argues give it the "right" to dispose of all produced water. COG contends these ancillary agreements support its argument that the parties intended to transfer the oil and gas waste to COG. But the stated purpose of these agreements is to establish guidelines and payments for ***use*** of the surface and to grant ***use*** of the surface, respectively. Unlike the majority, I would hold that neither the surface use agreements nor the right-of-way agreements support a transfer of ownership of produced water.[2]

In fact, the parties' recognition of water and "produced water" as being distinct substances from oil and gas—listing water along with oil and gas in the substances that may be gathered, stored, and transported under the ancillary agreements—indicates the parties recognized that water and "produced water" were separate substances from the oil and gas specifically granted by the leases themselves. Certainly, the parties could have included additional substances in the granting clause (as such were included in the ancillary agreements), if they had intended the additional

---

[2] Also inapplicable here are the cases COG cites for the proposition that the right to develop includes the right to dispose of produced water. *See Brown v. Lundell*, 344 S.W.2d 863, 867 (Tex. 1961), *Turner v. Big Lake Oil Co.*, 96 S.W.2d 221 (Tex. 1936), and *TDC Eng'g, Inc. v. Dunlap*, 686 S.W.2d 346, 349 (Tex. App.—Eastland 1985, writ ref'd n.r.e.). These cases deal with the right to use the leased premises to dispose of salt water and do not grant ownership of the water to the mineral lessee. Contrary to COG's representation, any "core principle" underlying these cases has to do with the producer's obligation to responsibly dispose of salt water, not the producer's ownership of it. *See Brown*, 344 S.W.2d at 864; *Turner*, 96 S.W.2d at 221; *TDC Eng'g*, 686 S.W.2d at 347.

substances that were allowed to be gathered, stored, transported, and even disposed of, were also meant to be conveyed to COG. *See CKB & Assocs., Inc. v. Moore McCormack Petro., Inc.*, 734 S.W.2d 653, 655-56 (Tex. 1987); *In re Estate of Anderegg*, 360 S.W.3d 677 (Tex. App.—El Paso 2012, no pet.); *In re Choice! Energy, L.P.*, 325 S.W.3d 805, 809 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *OXY USA, Inc. v. Sw. Energy Prod. Co.*, 161 S.W.3d 277, 285 (Tex. App.—Corpus Christi 2005, pet. denied).

Additionally, I am not persuaded by COG's argument that the parties generally intended to convey anything and everything that came through the wellbore with the conveyed oil and gas. This "general intent" test has been applied when it is "not clear exactly what the term 'minerals' encompasses," and it supplies a presumption "that the parties intended the conveyance of only those substances which would allow them the full enjoyment of their respective estates." *Schwarz v. State*, 703 S.W.2d 187, 189 (Tex. 1986). The Supreme Court recognized this test as "merely a device for construing ambiguous conveyances." *Id.* Importantly, it also cautioned that, "[i]f there is an express conveyance of a specific substance, or some other controlling rule of construction indicating a different intent, we are not bound to follow [the] presumption." *Id.*; *see also Wilderness Cove, Ltd. v. Cold Spring Granite Co.*, 62 S.W.3d 844, 848-49 (Tex. App.—Austin 2001, no pet.) ("In examining a deed containing a specific conveyance of a mineral interest, courts must strive to give effect to the intentions expressed in the document itself."). Here, specific substances were conveyed—oil and gas—yet another substance—water, which is a substance that must be specifically conveyed—was not likewise included in the operative language. I would conclude the "general intent" test does not apply.

## 2. The characterization of produced water

In my view, the majority's characterization of produced water as mere oil-and-gas waste does not automatically cause that substance to fall within the scope of the granting clause. Simply because water is produced from an oil-and-gas well does not necessarily change its character.[3]

For example, the Supreme Court of Texas has previously addressed the ownership of saltwater produced from a mineral lessee's well. *See Robinson*, 501 S.W.2d at 866. In *Robinson*, the owner of the mineral estate used one of its non-producing oil wells to produce saltwater for the purpose of repressurizing the oil-bearing formation. *Id.*; *see also Robinson v. Robbins Petrol. Corp., Inc.*, 487 S.W.2d 794, 796 (Tex. App.—Tyler 1972), *rev'd*, 501 S.W.2d 865 (Tex. 1973). The surface owner sued for damages, claiming the saltwater as his own. *Robinson*, 501 S.W.2d at 866. The mineral lessee countered that salt water produced from a well should be treated differently from fresh water, which had been held to be part of the surface estate. *Id.* at 867 (quoting *Sun Oil Co.*, 483 S.W.2d 808 (Tex. 1972)). The Supreme Court used language applicable to the case at hand, stating as follows:

> We are not attracted to a rule that would classify water according to a mineral contained in solution. Water is never absolutely pure unless it is treated in a laboratory. It is the water with which these parties are concerned and not the dissolved salt. . . . **[T]he water itself is an incident of surface ownership in the absence of specific conveyancing language to the contrary.** And in our case the saline content has no consequence upon ownership.

*Id.* (emphasis added) (internal citation omitted).

---

[3] At times, the terms "produced water" and "salt water" have been used interchangeably. *See Ambassador Oil Corp. v. Robertson*, 384 S.W.2d 752, 760 (Tex. App.—Austin 1964, writ ref'd n.r.e.) (attorney and deponent used "produced water," "salt water," and "water" interchangeably, and the court did not distinguish between the two, referring to the substance as "salt water"); *Exxon Corp. v. Train*, 554 F.2d 1310, 1313 (5th Cir. 1977) (referring to "brine" parenthetically as "produced water"); *American Petroleum Institute v. E.P.A.*, 661 F.2d 340, 343 (5th Cir. 1981) (referring to "produced water" as "unsavory mineral water").

8

*Robinson* makes it clear that not just freshwater, but even deeper, mineralized water produced from a well, belongs to the surface estate and is only transferred through a specific conveyance. *Id*. Based on *Robinson*, I see no distinction between subsurface water and produced water. Rather, if a mineral producer seeks to separate its portion of the product stream from a wellhead, the producer may do that (and I suspect it already does). That is, a producer is entitled to recover minerals granted under the lease from the product stream itself. But water by any name, even when mixed with other substances, still remains as water. The Supreme Court of Texas has not distinguished between different types of groundwater indicating that some water does not belong to the surface estate. And it has never indicated that a specific reservation is required to maintain water ownership rights, as the majority suggests the landowners should have done in this case. Following established Texas precedents, I would conclude that absent a specific conveyance of the groundwater estate, a portion of the product stream remained a part of the surface estate.

Subject to lease terms otherwise limiting the use of water, I believe the Court should have concluded that the accommodation doctrine applied such that COG was permitted a reasonable use of the produced water, but not its ownership. The accommodation doctrine balances the rights between the dominant and subservient estates, providing that the mineral estate owner has an implied right to use so much of the surface as is reasonably necessary to develop and produce its minerals, though it "must exercise that right with due regard for the landowner's rights." *Coyote Lake Ranch*, 498 S.W.3d at 55. In the absence of any lease language governing the ownership of produced water, I believe the accommodation doctrine applies under the circumstances. As an owner of the mineral estate, COG has the right to use the produced water as is reasonably necessary for its production of oil and gas, but it has no ownership rights to that estate. *See id.; Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 50 (Tex. 2017).

### 3. The surrounding facts and circumstances

None of the leases define the terms "water" or "produced water." The majority concludes that ancillary agreements, regulatory definitions, and industry practices may all be consulted to determine the parties' intent regarding produced water and the scope of the mineral conveyance. Contrary to *URI's* directive, the majority considers surrounding facts and circumstances to make the leases' "'say what [they] unambiguously do[ ] not say'" and "'to show that the parties probably meant . . . something other than what their agreement[s] stated.'" *See URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 757 (Tex. 2018). By doing so, the Court concludes the mineral leases transferred not only the oil and gas produced from the land, but also the entire product stream. I disagree.

### a. The timing of the "statutory framework"

Contrary to well-established authority, the majority classifies produced water as waste, not as water. Citing to statutory and regulatory definitions for "relevant context," the majority claims the Texas Legislature drew a "clear distinction" between produced water and groundwater. However, only the definition of fluid oil and gas waste found in § 122.001(2) of the Texas Natural Resources Code includes produced water in a list but does not otherwise define it. *See* TEX. NAT. RES. CODE ANN. § 122.001(2). Still, the majority recognizes that § 122.002 is not controlling being that it was adopted only after the signing of these oil and gas leases. Similarly, however, § 122.001 was added at the same time by the same legislative act. *See id.* §§ 122.001, .002. Certainly, then, this legislative "framework" provides no point of reference upon which the parties seemingly based their agreement.

### b. The "regulatory framework"

The majority also determines that an operator's statutory duty to protect groundwater provides support for the proposition that the surface owner intended to surrender its ownership rights merely because the operator was legally bound to dispose of waste. I disagree.

The mineral lessee's duty to properly dispose of waste is typically dictated through three sources—contracts, statutes, and regulations. Until passage of § 122.002 of the Natural Resources Code—which the majority concedes does not apply and is inapplicable when a contract so provides—no statute conveyed ownership based merely on a duty to properly dispose of oil and gas waste. Further, the Railroad Commission's governance over such disposal also provides no authority to effectuate a transfer of property rights. *See Nale v. Carroll*, 289 S.W.2d 743, 745 (Tex. 1956).

Here, I disagree that the regulatory framework plays any role in determining the ownership of produced water under these leases. I would conclude the regulatory framework did not convey title of the produced water to COG.

### c. Industry practices

Finally, the majority also attributes an industry practice of operators processing, transporting, and disposing of oil and gas waste as a basis for lease interpretation. COG argues, and the majority agrees, that the development rights granted by the leases evidence an intent to transfer ownership of the produced water along with the oil and gas waste.

Without stating so, the majority's holding seems to treat this circumstance as one wherein the landowner has waived its rights to any water included in the produced oil and gas waste. But waiver requires an "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Paxton v. City of Dallas*, 509 S.W.3d 247, 262 (Tex. 2017). A party's

11

actions in "allowing" a party to carry out its statutory, regulatory, or contractual duties with respect to waste does not necessarily reflect a waiver of ownership rights, as doing so is not unequivocally inconsistent with such ownership. *See Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, 595 S.W.3d 668, 677 (Tex. 2020).

Here, the majority rewards COG for the "costs and risks" it undertook in disposing of oil and gas waste. It claims the parties only recently perceived such waste as having independent value. But none of this analysis is applicable here. Without doubt, water was not conveyed by the scope of the granting clauses of the leases at issue here, unlike the uranium transferred by the "other minerals" language included in the lease in *Moser*. *See Moser v. U.S. Steel Corp.*, 676 S.W.2d 99 (Tex. 1984). Here, the parties' knowledge of the potential value of produced water was not irrelevant because of the holding in *Moser*. Rather, that knowledge is irrelevant because water, as a substance, was not expressly severed from the surface estate. And unlike the producer in *Bowden*, who undertook "costs and risks" to add value to its production by separating the components of the conveyed natural gas, COG did not voluntarily undertake anything—COG was both contractually and statutorily required to dispose of or otherwise deal with produced water in a manner that would not harm the surface estate or the environment generally. *See Bowden v. Phillips Petro. Co.*, 247 S.W.3d 690, 706 (Tex. 2008).

## II. CONCLUSION

In sum, I disagree with the majority's consideration of surrounding facts and circumstances to interpret whether the leases conveyed produced water. Particularly in the oil-and-gas field, parties depend on courts "for continuity and predictability in the law," relying on principles pronounced by the Supreme Court of Texas. *Wenske v. Ealy*, 521 S.W.3d 791, 798 (Tex. 2017). Based on long established principles, I would conclude the oil and gas leases contain no express

conveyance of water to COG. Instead, I would conclude the surface estate's water rights were conveyed to Cactus by the assignment of rights to produced water. Because the majority concludes otherwise, I respectfully dissent.

GINA M. PALAFOX, Justice

July 28, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.