

**In the**
**Court of Appeals**
**Second Appellate District of Texas**
**at Fort Worth**

_____

No. 02-21-00364-CV

_____

TEXAS HEALTH HUGULEY, INC., D/B/A TEXAS HEALTH HUGULEY
HOSPITAL FORT WORTH SOUTH, DR. JASON SEIDEN, JOHN DOES #1-5,
AND JANE ROES #1-5, Appellants

V.

ERIN JONES, INDIVIDUALLY AND AS LEGAL REPRESENTATIVE AND
NEXT FRIEND OF JASON JONES, Appellee

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-329996-21

Before Sudderth, C.J.; Kerr and Womack, JJ.
Opinion by Chief Justice Sudderth

**OPINION**

Jason Jones faces death at Texas Health Huguley Hospital Fort Worth South,[1] and his wife Erin—having heard that Ivermectin might help her loved one—filed suit to force the hospital and its relevant staff to give her husband the drug. The trial court, reluctant to force the hospital and its physicians to administer a treatment they opposed, instead issued a temporary injunction ordering Huguley to grant a Houston-based, Ivermectin-prescribing physician temporary hospital privileges for the sole purpose of administering Ivermectin to Mr. Jones in Huguley's intensive care unit.[2]

But judges are not doctors. We are not empowered to decide whether a particular medication should be administered, or whether a particular doctor should be granted ICU privileges.[3] Our role is to interpret and apply the law as written. Although we may empathize with a wife's desire to try anything and everything to save her

---

[1]Texas Health Huguley, Inc. does business as Texas Health Huguley Hospital Fort Worth South.

[2]Huguley and its relevant staff seek our review of the temporary injunction through this accelerated interlocutory appeal. Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (authorizing interlocutory appeal of order granting temporary injunction); Tex. R. App. P. 28.1(a) (providing accelerated timeline for interlocutory appeals).

[3]We recognize that there may be situations in which a court appears to decide such questions based on, for example, a plaintiff's probable right to recover on a Section 1983 due process claim. *Cf. T.L. v. Cook Children's Med. Ctr.*, 607 S.W.3d 9, 94 (Tex. App.—Fort Worth 2020, pet. denied), *cert. denied*, 141 S. Ct. 1069 (2021); *see also* 42 U.S.C. § 1983.

husband, we are bound by the law, and the law in this case does not allow judicial intervention. Just as we cannot legislate from the bench, we cannot practice medicine from the bench. Therefore, we vacate the trial court's temporary injunction.[4]

## I. The Facts

Jason Jones is a 48-year-old Tarrant County law enforcement officer and the father of six children. Although he contracted COVID-19 in September, he is no longer infected with the virus. Rather, he now suffers from its aftereffects.

### A.      Mr. Jones contracted COVID-19.

Mr. Jones tested positive for COVID-19 on September 23, 2021, and five days later he was admitted to Huguley.[5] Almost immediately, Mr. Jones began receiving

---

[4]Generally, the Rules of Appellate Procedure require the clerk of this court to send the parties notice that the case is set for submission at least 21 days in advance. Tex. R. App. P. 39.8. But we may shorten the time for submission of a case "in the interests of justice," Tex. R. App. P. 38.6(d), and we may suspend the 21-day notice requirement altogether "to expedite a decision or for other good cause." Tex. R. App. P. 2. Because justice—an undeniably good cause—necessitates an expedited timeline for submission of this case, we have suspended Rule 39.8's notice requirement and shortened the timeline for submission to November 17, 2021.

[5]Prior to admission at Huguley, Mr. Jones went to Harris Southwest. However, when Harris Southwest wanted to treat him with Remdesivir, he declined the treatment and left the facility.

3

treatment from Dr. Jason Seiden,[6] who treated him with steroids and antibiotics.[7] Even after Mr. Jones received this treatment, his condition did not improve, and both of his lungs eventually collapsed. On October 7, he was placed on a ventilator and moved to Huguley's ICU in a medically induced coma. There he remains.

After watching her husband's decline, Erin Jones—understandably desperate—researched COVID-19 treatments and learned about Ivermectin. When Mrs. Jones asked the hospital about administering Ivermectin and "[t]hey said no,"[8] Mrs. Jones found Dr. Mary Talley Bowden online, and the two conducted a telehealth visit. After discussing Mr. Jones's condition with Mrs. Jones for nearly an hour, Dr. Bowden prescribed to Mr. Jones four infusions and 12 drugs, including Ivermectin.

## B. Mrs. Jones filed suit, seeking to compel Huguley and Dr. Seiden to administer Ivermectin.

Prescription in hand, Mrs. Jones sued Huguley and those working under it, naming Dr. Seiden, along with ten unidentified hospital workers, as defendants. Mrs. Jones alleged that the hospital and its relevant staff violated state and federal law by ignoring her Ivermectin request, that they violated their implied hospital–patient and

---

[6]The record contains two different spellings of Dr. Seiden's name. We use the spelling on Dr. Seiden's own filings.

[7]Mr. Jones refused most of the drugs in Huguley's COVID-19 protocol, including Remdesivir and Actemra.

[8]It is unclear in the record to whom at Huguley Mrs. Jones made this request.

4

doctor–patient contracts with Mr. Jones, and that they violated their Hippocratic Oaths to do no harm. She sought a declaratory judgment recognizing these alleged statutory and contractual violations, as well as temporary and permanent injunctive relief forcing the hospital and its staff to administer Ivermectin to her husband.

Within twenty-four hours of filing her case, on October 26, Mrs. Jones obtained an ex parte temporary restraining order requiring Huguley to administer Ivermectin. Claiming that the order was void, Huguley refused to comply and challenged the order by filing a petition for writ of mandamus with this court. Before we could rule on the mandamus petition, the case was transferred to a different trial court, and Mrs. Jones agreed to dissolve the temporary restraining order in exchange for an expedited evidentiary hearing on her motion for more lasting relief: a temporary injunction that would stay in effect until trial.

Mrs. Jones then amended her pleadings and asked the trial court to "declar[e] and enforc[e] her authority as Wife of Mr. Jones" and declare and enforce "Dr. Bowden's order and prescription to administer Ivermectin to Mr. Jones." Pending trial, Mrs. Jones requested "preliminary injunctive relief [to] Order Defendants to comply with Doctor Mary Talley Bowden, M.D.'s order and prescription to administer Ivermectin to their mutual patient, Jason Jones."

## C.    The trial court held a temporary injunction hearing.

The trial court held an evidentiary hearing on the temporary injunction request. From the beginning, the court expressed reluctance to force Huguley or Dr. Seiden to

5

administer a treatment they disagreed with, but the court asked why the hospital would not permit Dr. Bowden to administer the treatment, inquiring "why, if [Mrs. Jones] ha[d] somebody that's willing to administer [Ivermectin], to come in [to Huguley] and [Mrs. Jones is] obviously waiving any liability against the hospital, why is it not allowed for them to do that?" Taking the trial court's cue, Mrs. Jones encouraged the court to order such relief. Although she did not amend her pleadings to match the injunctive relief the trial court now proposed, the parties expanded their focus at the temporary injunction hearing to encompass the trial court's proposed form of relief. They offered not only evidence of the propriety of administering Ivermectin to COVID-19 patients—the core of their dispute—but also evidence of Huguley's credentialing procedures.[9]

Mrs. Jones testified first. She described her husband's condition, her desire to give him Ivermectin, and her willingness to release Huguley and Dr. Seiden from all liability if they would administer the drug.[10]

---

[9]At the hearing, the trial court received at least one binder with Huguely's supporting exhibits. The relevant binder or binders are not included in the record.

Additionally, after the evidentiary hearing, the trial court held a telephone conference with the parties' counsel. We do not have a reporter's record for the telephonic hearing either, but it appears that at that hearing the trial court requested additional briefing on the credentialing laws.

[10]Mrs. Jones admitted that she did not have a written contract with Huguley or any of the doctors working there, contrary to the allegation in her petition.

Dr. Bowden, an otolaryngologist, also testified. She stated that she had prescribed Ivermectin for "hundreds of people" and "treated thousands of COVID patients," with "excellent results." But Dr. Bowden also acknowledged that she did not have a completely accurate picture of Mr. Jones's medical condition when she wrote the Ivermectin prescription.[11] Nevertheless, she testified that this did not matter or change her recommendation for Ivermectin "because this man is dying." She explained her exhaustive 16-item prescription by stating that she "prescribed what was on . . . [the] FLCCC [Frontline COVID-19 Critical Care Alliance] protocol for patients that are in the hospital and dying of COVID."

Dr. Seiden testified as well, explaining Mr. Jones's treatment and Huguley's COVID-19 protocol. Dr. Seiden stated that Mr. Jones had refused most of Huguley's COVID-19 protocol[12]—including Remdesivir and Actemra—and that neither Mr. nor Mrs. Jones had asked him to administer Ivermectin when Mr. Jones was infected with the virus. According to Dr. Seiden, he first learned of the Ivermectin request when

---

[11]Mr. Jones did not participate in Mrs. Jones's telehealth call with Dr. Bowden. Dr. Bowden had not seen Mr. Jones in person or reviewed his medical records prior to writing the prescription for Ivermectin.

[12]The doctor explained that he had not prescribed Ivermectin while treating Mr. Jones's COVID-19 because the Food and Drug Administration (FDA) had issued a warning that the drug should not be used for COVID-19 treatment, and because, likely for the same reason, the drug was not part of Huguley's COVID-19 protocol.

Mrs. Jones filed suit.[13]  Regardless, Dr. Seiden testified that Mr. Jones is no longer infected with the virus.  Instead, Dr. Seiden explained that Mr. Jones is now being treated for the aftereffects of COVID-19.[14]  And Dr. Seiden explained that because there is ostensibly no evidence that Ivermectin is beneficial for the aftereffects of COVID-19, he found no clinical reason to administer it.[15]

---

[13]Dr. Seiden's testimony that he was never asked to administer Ivermectin prior to the suit's filing raises questions as to the "extreme necessity" of the temporary injunction.  *See RP&R, Inc. v. Territo*, 32 S.W.3d 396, 401 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (noting that mandatory injunction should not be granted absent "extreme necessity or hardship").  But Dr. Seiden was well aware of Mrs. Jones's Ivermectin request by the time of the hearing, and his testimony at the hearing left no question as to his unwillingness to prescribe the medication.  Although there is no evidence in the record that all of the physicians with Huguley privileges felt similarly, the appellants did not raise this issue, so we decline to address it.

[14]Mrs. Jones asserts that Dr. Seiden exhibited "a certain disdain" for Mr. Jones based on Mr. Jones's refusal of certain medical treatments.  And, during his testimony, Dr. Seiden gratuitously attributed Mr. Jones's condition and poor chances of survival—which he estimated at approximately 10 to 15%—to "the unfortunate consequence of [Mr. Jones's] unvaccinated poor state of health."  While such comments during a court proceeding may have been unhelpful and insensitive, they do not provide evidence that Dr. Seiden violated "the right of the patient to considerate and respectful care," as Mrs. Jones alleges.  *See* 25 Tex. Admin. Code § 133.42(a)(1)(B) (2021) (Tex. Dep't of State Health Servs., Patient Rights).  Moreover, Dr. Seiden could not himself violate the quoted regulation; Rule 133.42(a) applies to hospital licensing and operational requirements—not individual physicians.  *See* 25 Tex. Admin. Code ch. 133 (2021) (Tex. Dep't State Health Servs., Hospital Licensing).

[15]In fact, Dr. Seiden opined that administering Dr. Bowden's prescription to Mr. Jones at this stage could worsen his current condition rather than help him.

Huguley representative Tandra Cobern provided testimony regarding the hospital's credentialing procedures. Cobern confirmed that these procedures—set forth in Huguley's bylaws—are based on the Centers for Medicare & Medicaid Services (CMS) Conditions of Participation. She indicated that if a physician such as Dr. Bowden applied for privileges at Huguley and met the standard credentialing criteria— criteria that set minimum requirements for, among other things, medical competence, training, licensure, and liability insurance—the doctor would likely be granted hospital privileges.[16]

But, according to Cobern, even after going through Huguley's credentialing procedure, an otolaryngologist such as Dr. Bowden would not be able to administer Ivermectin to Mr. Jones because Mr. Jones is in Huguley's ICU, a location where otolaryngologists are not able to practice. As she explained, the ICU is a closed unit limited to "intensivists."[17]

---

[16]It is undisputed that Dr. Bowden did not apply for credentials prior to the temporary injunction hearing. This fact also raises questions as to the "extreme necessity" of the injunction, as Huguley did not have an opportunity to consider her application absent a court order. *See RP&R, Inc.*, 32 S.W.3d at 401 (noting that mandatory injunction should not be granted absent "extreme necessity or hardship"). Furthermore, Dr. Bowden already had privileges at a different hospital. Regardless, the appellants did not raise this issue, so we need not address it.

[17]Although Cobern did not explain how a physician qualifies as an "intensivist," the hospital's filings indicate that this label requires board certification in critical care, which Dr. Bowden did not possess.

9

**D.** **The trial court granted a temporary injunction compelling Huguley to grant Dr. Bowden temporary ICU privileges.**

After hearing the testimony, the trial court instructed Dr. Bowden to submit an application for temporary ICU privileges at Huguley, and the court indicated that it would require Huguley to grant the doctor such privileges.[18] A few days later, the trial court signed a written order requiring Huguley to allow Dr. Bowden access to the ICU to administer Ivermectin to Mr. Jones and to grant Dr. Bowden temporary emergency privileges to do so:

> ORDERED, that . . . the Defendants, their agents, and assigns, and any third parties acting on its behalf . . . shall grant Dr. Mary Talley Bowden, M.D.[,] and/or her nurse working under her authority, temporary emergency privileges, which shall not be unreasonably delayed or denied, solely to administer Ivermectin to Jason Jones, pursuant to the order and the attached Prescription of Dr. Bowden; and it is further
>
> . . . .
>
> ORDERED, that Dr. Bowden and/or her nurse working under her authority, is granted access in the ICU at Texas Health Huguley Hospital

Dr. Bowden implicitly acknowledged that ICU care was beyond her normal scope of practice, testifying that she would treat Mr. Jones's respiratory distress by

> consult[ing] a pulmonologist to handle that portion of his care, which is what any physician would do, which would be a standard of care. But I am the one who has more experience than most in prescribing Ivermectin, which is what makes me more qualified to do it. And I have been prescribing it for hundreds of people[;] I have treated thousands of COVID patients. This is within my realm.

[18]Dr. Bowden complied, but there is no indication that Huguley has acted on Dr. Bowden's application for emergency temporary hospital privileges since the temporary injunction was issued; it appears the application is still under review.

to Jason Jones for the sole purpose of administering [I]vermectin . . . ; and it is further

ORDERED, that Defendants . . . are not required to administer [I]vermectin to Jason Jones nor are they required to provide the medication for Dr. Bowden[.][19]

Huguley immediately sought this court's review, *see* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4), and we stayed the temporary injunction pending this accelerated appeal, *see* Tex. R. App. P. 28.1(a).

## II.  The Role of Hospitals vs. the Role of the Judiciary

This case turns on the role of health care providers[20] versus that of the judiciary.[21] All parties in this case agree that, under state and federal law, a physician such as Dr. Bowden must have hospital privileges to administer medication to a patient at Huguley. And all parties agree that, absent a court order, Huguley has the legal discretion to grant,

---

[19]*See* Tex. R. Civ. P. 683.

[20]*See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(11) (defining "[h]ealth care institution" to include "a hospital" or "a hospital system"), § 74.001(a)(12)(A) (defining "[h]ealth care provider" to include "a health care institution").

[21]On appeal, Huguley and Dr. Seiden argue that the trial court abused its discretion (i.e., exceeded its authority) by issuing the injunction.  Though the appellants frame their arguments in six sections, they raise three main issues:  (1) that the injunction compels them to violate state and federal credentialing laws; (2) that the injunction does not preserve the status quo; and (3) that the injunction was issued without a valid underlying cause of action.  We begin by explaining why we need not address the credentialing issue, because our resolution turns on a more basic, central issue—the role of the judiciary when reviewing the physical and mental health decisions made by physicians or health care providers.

11

deny, or limit a doctor's hospital privileges in accordance with Huguley's bylaws. Mrs. Jones does not challenge the validity or legality of the hospital's bylaws in any way. Instead, she asks the judiciary to compel Huguley to exercise its credentialing discretion in a certain manner, and Huguley claims that doing what Mrs. Jones asks would force it to violate state and federal credentialing laws.

Despite Huguley's counterargument, the salient question is not really whether judicial intervention would force Huguley to violate the credentialing laws. And the question is not (as the trial court asked) "why is it not allowed" for a non-credentialed doctor to be temporarily admitted to the ICU to administer Ivermectin to a dying man. The overarching question is whether the law gives the judiciary the authority to intervene and compel a particular outcome in the hospital's legal exercise of its discretion to make credentialing decisions.

Patients go to the hospital to have physicians, nurses, and similar medical personnel exercise their professional judgment—honed by years of medical training and experience—to recommend and administer medical treatment. As a society, we not only expect, but require, doctors and hospitals to exercise their independent professional judgment.[22]

---

[22]Mrs. Jones accurately observes that a hospital does not practice medicine. *See T.L.*, 607 S.W.3d at 59 ("The Texas Medical Practice Act generally prohibits the corporate practice of medicine."); *cf., e.g.*, 22 Tex. Admin. Code § 177.17(a) (2021) (Tex. Med. Bd., Exception to Corporate Practice of Medicine Doctrine) (summarizing "[t]he

The trial court recognized as much when it expressed reluctance to force Huguley and Dr. Seiden to go against their professional judgment by administering Ivermectin. But what the trial court overlooked is that, just as a doctor exercises his or her judgment in providing medications, a hospital also exercises its judgment in how and to whom it chooses to grant hospital privileges.[23]

---

corporate practice of medicine doctrine [a]s a legal doctrine, which generally prohibits corporations, entities or non-physicians from practicing medicine"). As we discuss below, though, a hospital does owe its patients a standard of care and is expected—even legally required—to exercise its reasonable professional judgment.

[23]Huguley attempts to distance itself from this responsibility, noting that the Credentials Committee—whose voting members are physicians not employed by the hospital—is responsible for reviewing applications for clinical privileges and making recommendations to the medical executive committee. And there is no evidence in this record that members of the Credentials Committee are under the hospital's control. But Huguley is responsible for establishing the procedures the Credentials Committee follows. And, in establishing the timeframe for review of an application for hospital privileges, the Texas Health and Safety Code requires that, after "[t]he hospital's credentials committee" completes its review, "[t]he governing body of the hospital shall take final action on the application for medical staff membership or privileges." Tex. Health & Safety Code Ann. § 241.101(k). The Code even defines "medical staff" as "a physician or group of physicians . . . who *by action of the governing body of a hospital* are privileged to work in and use the facilities of a hospital." *Id.* § 241.003(8) (emphasis added). As the Attorney General has opined, "[u]nder these statutes, the [hospital's governing b]oard is the only entity authorized to appoint staff members or grant privileges." Tex. Att'y Gen. Op. No. GA-0102 (2003) (recognizing that the governing board may delegate certain other responsibilities).

Nonetheless, Huguley's point is well taken. There is no evidence in the record that Huguley can control the actions or recommendations of the Credentials Committee. And although Mrs. Jones attempts to turn this issue on its head by claiming Huguley failed to prove that its lack of control "would be an impediment to this

"A hospital is not a mere hostery providing room and board and a place for physicians to practice their craft, but owes independent duties of care to its patients." *Tenet Health Ltd. v. Zamora*, 13 S.W.3d 464, 471 (Tex. App.—Corpus Christi–Edinburg 2000, pet. dism'd w.o.j.). Because "[o]ne of a hospital's primary functions is to provide a place in which doctors dispense health care services," and because "[t]he quality of a health care provider's medical staff is intimately connected with patient care[, a] hospital's credentialing of doctors is necessary to that core function and is, therefore, an inseparable part of the health care rendered to patients." *Garland Cmty. Hosp. v. Rose*, 156 S.W.3d 541, 545 (Tex. 2004) (discussing negligent credentialing claim).

By credentialing a physician, a hospital such as Huguley represents that the physician has been reasonably vetted by others with medical training.[24]

_____

temporary injunction," the burden of proof was on Mrs. Jones—not Huguley. *See T.L.*, 607 S.W.3d at 34; *Lifeguard Benefit Servs., Inc. v. Direct Med. Network Sols., Inc.*, 308 S.W.3d 102, 111 (Tex. App.—Fort Worth 2010, no pet.).

[24]*See Tenet Health Ltd.*, 13 S.W.3d at 471 ("A hospital owes duties directly to its patients . . . to use reasonable care in formulating the policies and procedures that govern its medical staff and nonphysician personnel, to exercise reasonable care in the selection of its medical staff, and to periodically monitor and review the medical staff's competence.").

It is the hospitals—not the courts—that have the training, responsibility, and discretion to "determine, in accordance with state law and with the advice of the medical staff, which categories of practitioners are eligible candidates for appointment to the medical staff." 25 Tex. Admin. Code § 133.41(f)(4)(F) (2021) (Tex. Dep't of State Health Servs., Hospital Functions and Services); *see* Tex. Health & Safety Code Ann. § 241.101(a) (providing limited inapplicable exceptions but otherwise affirming

14

This is not to say that the judiciary will never intervene in a hospital's treatment or credentialing procedures. Indeed, this very court has done so. *See T.L.*, 607 S.W.3d at 94 (holding appellant stated viable cause of action and probable right to recovery on Section 1983 claim premised on imminent discontinuance of medical treatment, and remanding case for entry of temporary injunction to prevent the discontinuance of life-sustaining medical care pending trial). But, unlike the facts in *T.L.*, this is not a case

---

hospital's authority to "make rules, standards, or qualifications for medical staff membership" and to "grant or refuse to grant membership on the medical staff"); *see also Sosa v. Bd. of Managers of Val Verde Mem'l Hosp.*, 437 F.2d 173, 176 (5th Cir. 1971) (noting that in determining "personal fitness for medical staff privileges precise standards are difficult if not impossible to articulate"). And if a patient receives subpar medical treatment from a doctor who should not have been granted hospital privileges, or whose privileges should have been limited to the doctor's area of practice, *see* Tex. Health & Safety Code Ann. § 241.102(a), the hospital may be liable for negligently credentialing the physician and failing to exercise the appropriate professional judgment. *Garland Cmty. Hosp.*, 156 S.W.3d at 546 ("When a plaintiff's credentialing complaint centers on the quality of the doctor's treatment, as it does here, the hospital's alleged acts or omissions in credentialing are inextricably intertwined with the patient's medical treatment and the hospital's provision of health care.").

"The governing board of a hospital must therefore be given great latitude in prescribing the necessary qualifications for potential applicants," *Sosa*, 437 F.2d at 176, for "[i]t would be illogical to impose a duty to use reasonable care upon a hospital, but to deprive the hospital of the ability to implement policies and programs that it deems reasonable," *Tenet Health Ltd.*, 13 S.W.3d at 471–72 (holding trial court abused its discretion by granting temporary injunction because physician, who sought injunctive relief due to limitations on exercise of hospital privileges, did not demonstrate probable right to recovery).

15

where the hospital is threatening to withdraw Mr. Jones's ventilator or discontinue a similar source of life-sustaining medical care. *Cf. id.*

The judiciary is called upon to serve in black robes, not white coats. And it must be vigilant to stay in its lane and remember its role. Even if we disagree with a hospital's decision, we cannot interfere with its lawful exercise of discretion without a valid legal basis. *See Coyote Lake Ranch, LLC v. City of Lubbock*, 498 S.W.3d 53, 65 (Tex. 2016) ("[A]n injunction 'so broad as to enjoin a defendant from activities which are a lawful and proper exercise of his rights' is an abuse of discretion." (quoting *Holubec v. Brandenberger*, 111 S.W.3d 32, 39–40 (Tex. 2003))); *Muniz v. Tex. Dep't of Crim. Just.*, No. 13-06-366-CV, 2008 WL 2764518, at *3 (Tex. App.—Corpus Christi–Edinburg July 17, 2008, no pet.) (mem. op.) (holding trial court properly denied temporary injunction based on alleged failure to provide adequate medical treatment because "[c]ourts have disavowed any attempt to second-guess the propriety or adequacy of a particular course of treatment"); *see also Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam) (holding, where prisoner sought judicial intervention based on allegation of inadequate medical treatment, that "[q]uestions of medical judgment are not subject to judicial review").[25] As we explain below, there is no valid legal basis to do so on these facts at this stage of the proceeding.

_____

[25]We recognize that the law governing the treatment of private individuals in private hospitals differs from that governing the treatment of prisoners in state or

16

### III. The Law on Temporary Injunctions

With the proper role of the judiciary firmly in mind, we turn to the case at hand. Here, we need not determine the efficacy of Ivermectin—for COVID-19 or anything else. Rather, the question for us to decide is whether the trial court had the legal authority to issue the injunction that it did.

A temporary injunction is an extraordinary remedy; its "purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g); *see Coyote Lake Ranch, LLC*, 498 S.W.3d at 65; *T.L.*, 607 S.W.3d at 34. The burden rests squarely on the shoulders of the party seeking judicial intervention.[26] *See T.L.*, 607 S.W.3d at 34; *Lifeguard Benefit Servs., Inc.*, 308 S.W.3d at 111. That party must meet a three-prong test by pleading and proving these specific elements: (1) a viable cause of action against the party to be enjoined; (2) that, after a trial on the merits, the injunction-seeking party would probably be entitled to relief (i.e., she has a probable right to recovery); and

---

federal prison facilities. Nonetheless, in both contexts, the judiciary must not interfere with a disagreement among doctors on matters of professional judgment without a valid legal basis.

[26]On appeal, Mrs. Jones repeatedly attempts to shift the burden of proof to Huguley. She argues, for example, that Huguley failed to show that the Credentials Committee was not under the hospital's control and that it failed to show that the injunction violates the law. But it was Mrs. Jones—not Huguley—who bore the burden of proof in the trial court. *See T.L.*, 607 S.W.3d at 34; *Lifeguard Benefit Servs., Inc.*, 308 S.W.3d at 111.

(3) that she would suffer a probable, imminent, and irreparable injury absent the temporary injunction. *Butnaru*, 84 S.W.3d at 204; *Lifeguard Benefit Servs., Inc.*, 308 S.W.3d at 110–11.

Not only is an injunction an extraordinary remedy, but a court's authority to grant such relief is even more restricted when, as here, the requested injunction would compel affirmative action. An injunction compelling affirmative action is known as a mandatory injunction—as distinguished from a traditional, prohibitive injunction that forbids status-quo-altering conduct. *See Lifeguard Benefit Servs., Inc.*, 308 S.W.3d at 112; *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 576 (Tex. App.—Austin 2000, no pet.) ("A mandatory injunction requires conduct from a party, whereas a prohibitive injunction forbids conduct."); *see also Savering v. City of Mansfield*, 505 S.W.3d 33, 53 (Tex. App.—Fort Worth 2016, pet. denied) (Sudderth, J., dissenting) (construing injunction as mandatory while en banc opinion construed it as prohibitive).

A trial court may grant a mandatory injunction compelling affirmative action only if the injunction-seeking party provides a "clear and compelling presentation" as to the third prong—that the injunction is necessary to prevent irreparable injury or extreme hardship. *RP&R, Inc.*, 32 S.W.3d at 400–01; *see Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981); *Lifeguard Benefit Servs., Inc.*, 308 S.W.3d at 111–12; *Plano Data v. BP Am. Prod. Co.*, No. 05-16-00968-CV, 2016 WL 7230392, at *2 (Tex. App.—Dallas Dec. 14, 2016, no pet.) (mem. op.); *see also Savering*, 505 S.W.3d at 53–55 (Sudderth, J., dissenting) (construing injunction as mandatory and concluding

18

appellants failed to make clear and compelling presentation while en banc opinion construed injunction as prohibitive and held appellants carried their burden).

As the appellate court, our job is not to second-guess a trial court's discretionary decision to issue a temporary injunction. Instead, our job is to make sure that the trial court had the legal authority, and thus discretion, to issue an injunction at all. *See Butnaru*, 84 S.W.3d at 204; *SISU Energy, LLC v. Hartman*, No. 02-19-00436-CV, 2020 WL 4006725, at *7 (Tex. App.—Fort Worth July 16, 2020, no pet.) (mem. op.).

## IV. The Trial Court's Lack of Authority to Issue the Injunction

Undeniably, Mrs. Jones meets the third prong of the test. No one challenges that the risk of immediate, irreparable injury is present here. But clear proof of the third prong does not override the requirement that the first two elements must also be pleaded and proved for Mrs. Jones to prevail in her request for injunctive relief. And it is the first two prongs that block the trial court's ability to intervene in this case: (1) Mrs. Jones neither pleaded nor offered evidence to support a viable underlying cause of action, and thus (2) Mrs. Jones could not show a probable right to recovery. Here, because Mrs. Jones did not meet either of the first two prongs, the trial court had no legal authority to issue the injunction.[27] Without legal authority, the court could not

---

[27]Furthermore, there is no evidence that the temporary injunction will preserve the status quo. "The status quo is [defined as] 'the last, actual, peaceable, non-contested status which preceded the pending controversy.'" *T.L.*, 607 S.W.3d at 34 (quoting *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (orig. proceeding)); *see Universal Health Servs.,*

19

*Inc.*, 24 S.W.3d at 577 (holding that temporary injunction maintained status quo of keeping hospital open where dispute arose over attempt to close it because "[i]f an act of one party alters the relationship between that party and another, and the latter contests the action, the status quo cannot be the relationship as it exists *after* the action").

If we were to view the status quo as the preservation of Mr. Jones's pre-controversy medical treatment, the injunction would fail to preserve it because Mr. Jones's pre-controversy medical treatment did not involve the administration of Ivermectin, nor did it involve a protocol in which Ivermectin was anticipated.

But, here, all parties agree that the status quo is keeping Mr. Jones alive. *Cf. T.L.*, 607 S.W.3d at 94 (viewing maintenance of life as the status quo). Although Dr. Bowden championed Ivermectin as an effective treatment for COVID-19 itself, she did not comment on the medication's ability to repair the lingering lung damage that may remain after the fact. And the record contains no other evidence speaking to Ivermectin's efficacy to treat post-COVID-19 aftereffects. Because Mr. Jones no longer has COVID-19, there is no evidence in the record that Ivermectin would preserve his life or health.

While Dr. Bowden provided no record evidence that Ivermectin is an effective treatment for the aftereffects of COVID-19, Dr. Seiden explained that the thought behind using "Ivermectin [for active COVID-19] is to prevent further viral replication or reproduction in the cells, and that very hypothesized mechanism is no longer applicable, as [Mr. Jones is] no longer deemed to have the virus circulating in his body." Even assuming that Ivermectin is an effective treatment for COVID-19 itself, then, because Mr. Jones no longer has COVID-19, there is no evidence that administration of the drug would preserve the status quo.

And, again, a trial court has the authority to issue a temporary injunction only to preserve the status quo pending trial. *See Coyote Lake Ranch, LLC*, 498 S.W.3d at 65 (holding temporary injunction was abuse of discretion where, "[r]ather than preserve the status quo, which is its proper function, the temporary injunction denie[d] the City its undisputed right to access groundwater"); *Butnaru*, 84 S.W.3d at 204 ("A temporary injunction's purpose is to preserve the status quo . . . .").

20

interfere with the hospital's legal discretion to grant, deny, or limit Dr. Bowden's hospital privileges. Texas patients rely upon the medical professionals in hospitals—not the legal professionals in courts—to decide who receives ICU privileges.

**A.     The trial court had no authority to issue a temporary injunction unless Mrs. Jones proved her probable right to recover on a viable cause of action.**

"A party seeking a temporary injunction must have at least one valid legal theory to support a probable right to recover." *Argyle ISD ex rel. Bd. of Trs. v. Wolf*, 234 S.W.3d 229, 237–38, 250 (Tex. App.—Fort Worth 2007, no pet.) (holding that, because appellees did not offer evidence tending to show a probable right to recover on their claims, the trial court erred by issuing a temporary injunction); *see T.L.*, 607 S.W.3d at 34 ("A probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it."). Although Mrs. Jones was "not required to establish that she w[ould] ultimately prevail at trial on the merits," she acknowledges that she must still have demonstrated a right to recovery by "alleging a [viable] cause of action and presenting evidence tending to sustain it." *T.L.*, 607 S.W.3d at 34–35; *see Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993); *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 220 (Tex. App.—Fort Worth 2009, pet. denied). That is what is missing here.

Even liberally construing Mrs. Jones's live petition, none of the declaratory judgment claims she alleges are viable causes of action supported by any evidence. *See T.L.*, 607 S.W.3d at 34–35; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a).

**B.** **Mrs. Jones's declaratory judgment claims based on alleged administrative and statutory violations fail as a matter of law.**

First, Mrs. Jones's live petition sought declaratory judgments that "Defendants have violated Texas and Federal Law by denying Mr. Jones his legal right to make rational treatment decisions and choices, individually and through his Wife, Mrs. Jones." But her petition did not identify the allegedly violated law or laws.

Even speculating that she intended to allege a violation of one of the four relevant laws she referenced in her pleadings and arguments—(1) the informed consent law, (2) the state's limitations on pandemic-related liability, (3) CMS's administrative waiver of certain credentialing requirements, or (4) the Right to Try Act[28]—she has not

---

[28]On appeal, Mrs. Jones cites an additional administrative regulation; she argues that her pleadings also encompassed a declaratory judgment claim "for violations of patient rights" under 25 Tex. Admin. Code § 133.42(a)(1).

But Mrs. Jones's trial-court pleadings and arguments did not mention, cite, or even reference any alleged violations of Rule 133.42(a). She cannot "assert in the appellate courts for the first time a new ground for the granting of the injunction which had not been asserted in [her] pleading or presented to the trial court." *Oil Field Haulers Ass'n v. R.R. Comm'n*, 381 S.W.2d 183, 191 (Tex. 1964); *see Spring Branch ISD v. Stamos*, 695 S.W.2d 556, 559 (Tex. 1985) (reversing temporary injunction and rejecting appellees' attempt to raise a new theory in support of injunction because "[p]arties are restricted in the appellate court to the theory on which the case was tried in the lower court" (quoting *Safety Cas. Co. v. Wright*, 160 S.W.2d 238, 245 (Tex. 1942)).

Plus, the provision Mrs. Jones relies upon—Rule 133.42(a)(1)—does not support her position or request for injunctive relief. The cited regulation states that "[a] hospital shall adopt, implement, and enforce a policy to ensure patients' rights," regarding, for example, the right to receive a response to a request for treatment, the right to considerate and respectful care, and the right to accept or refuse medical treatment. 25

alleged facts that would constitute violations of these laws so as to present a viable cause of action.[29]

### 1. Texas's informed consent law is inapplicable.

Mrs. Jones's petition alleges that "Defendants have . . . unlawfully ignored instructions clearly expressed by the Plaintiff, Mr. Jones's legally authorized representative, thereby violating his right to exercise informed consent to accept and/or decline proposed treatment." Despite this allegation in her petition, though, Mrs. Jones's presentation at the temporary injunction hearing never mentioned or explained Huguley's or Dr. Seiden's alleged violations of the informed consent law. And although she relies upon these alleged violations to support the injunction on appeal, she does

---

Tex. Admin. Code § 133.42(a)(1)(A), (a)(1)(B), (a)(1)(C) (2021) (Tex. Dep't of State Health Servs., Patient Rights). But Mrs. Jones does not allege that Huguley failed to adopt a policy regarding patient care. Quite the opposite; Mrs. Jones faults Huguley for adopting and following its own patient-care policies.

And even if Mrs. Jones had alleged that Huguley failed to adopt a patient-rights policy under Rule 133.42, and even assuming that such an allegation could support a declaratory judgment claim, it is nonetheless unclear why the remedy for a Rule 133.42 violation would be forcing the hospital to grant hospital privileges to a specific doctor.

[29]The trial court's temporary injunction order—patterned after Mrs. Jones's proposed order—took judicial notice of, among other things, (1) the CMS waiver of 42 C.F.R § 482.22(a)(1)–(4); (2) the Right to Try Act in Texas Health and Safety Code Chapter 489; and (3) Section 74.155 of the Texas Civil Practice and Remedies Code, limiting hospitals' and physicians' liability for pandemic-related medical treatment. As noted above, Mrs. Jones did not mention or rely upon 25 Tex. Admin. Code § 133.42 in her pleadings or arguments, and the trial court's order did not reference this regulation.

not explain how the informed consent law applies. That is because it does not; the informed consent law is inapplicable.

Informed consent applies to a treatment actually "rendered" by a physician or health care provider; it does not apply to a treatment the patient wants to compel the physician or provider to render. *See, e.g.*, Tex. Civ. Prac. & Rem. Code Ann. § 74.101 (describing informed consent case as "based on the failure of the physician or health care provider to disclose or adequately disclose the risks and hazards involved in the medical care or surgical procedure *rendered* by the physician or health care provider" (emphasis added)). This is true whether the patient himself is providing the informed consent or the patient's spouse is consenting on his behalf. *See* Tex. Health & Safety Code Ann. § 313.004(a)(1).

The informed consent law is thus inapplicable. Mrs. Jones has neither alleged nor offered any evidence of an alleged violation of this law to support her declaratory judgment claim.

### 2. Texas's pandemic-related liability waiver is a shield, not a sword.

Nor did Mrs. Jones allege a viable declaratory judgment claim for a violation of Texas's pandemic-related liability waiver.

At the temporary injunction hearing, Mrs. Jones argued that the trial court should compel administration of Ivermectin because a Texas statute protects Dr. Seiden and Huguley from liability for any ill effects of the pandemic-related treatment. Mrs. Jones pointed to Section 74.155 of the Texas Civil Practice and Remedies Code, a statute that

24

provides that "a physician[ or] health care provider . . . is not liable for an injury . . . or death arising from care, treatment, or failure to provide care or treatment relating to or impacted by a pandemic disease" if the physician or health care provider proves two elements by a preponderance of the evidence. Tex. Civ. Prac. & Rem. Code Ann. § 74.155(b). Whether, at the end of the day, this statute might be invoked if liability for the medical care provided in this case were ever challenged, it is not applicable in the context of seeking a declaratory judgment to support a temporary injunction.

This statute provides a shield, not a sword. It allows a physician or health care provider a defense to pandemic-related liability, but it does not authorize a court to intervene and compel a physician to administer a specific pandemic-related treatment. *See id.* Indeed, if there was any doubt that this statute was intended to be used defensively rather than offensively, the text itself answers that question with abundant clarity, expressly providing that the statute "does not create a civil cause of action." *Id.* § 74.155(i). And there is nothing in this statute that requires physicians and health care providers to test the expanded boundaries of their pandemic-related liability by administering a treatment they disagree with.

Plus, even if this statute could be used as a sword, it applies only if "the individual who suffer[s] injury or death was diagnosed or reasonably suspected to be infected with a pandemic disease *at the time of the care[ or] treatment*." *Id.* § 74.155(b)(2) (emphasis added). Because Mr. Jones no longer has COVID-19, he is not currently "infected with [this] pandemic disease," thus creating a question as to whether his treatment here falls

25

within Section 74.155's scope at all.[30] *Id.* The plain language of the statute, then, precludes Mrs. Jones's declaratory judgment claim.

### 3. The CMS waiver, too, is a shield, not a sword.

Mrs. Jones's third referenced allegation—claiming that Huguley violated a CMS COVID-19 waiver—fails as well.

Mrs. Jones's trial counsel argued that mandating credentials for Dr. Bowden would not violate federal law because CMS waived some of the normal federal credentialing requirements due to COVID-19. Normally, the relevant CMS regulation requires a hospital's medical staff to, among other things, periodically conduct appraisals of its members (i.e., those with hospital privileges), to examine the credentials of individuals applying for hospital privileges, and to make recommendations to the hospital's governing body regarding hospital privileges and scope-of-practice limitations. *See* 42 C.F.R. § 482.22(a).[31] Mrs. Jones offered evidence that CMS waived these requirements "to allow for physicians whose privileges will expire to continue

---

[30]We further note that, in terms of credentialling, Section 74.155 expressly states that it "does not alter the scope of practice of a physician, health care provider, or first responder under the laws of this state." Tex. Civ. Prac. & Rem. Code Ann. § 74.155(e).

[31]*See also* 42 C.F.R. § 482.12(a) (requiring a hospital's governing body to, among other things, determine which categories of practitioners are eligible for appointment to the medical staff, appoint members of the medical staff after considering the existing staff members' recommendations, and ensure that members of the medical staff are accountable to the governing body for the quality of care provided).

practicing at the hospital and for new physicians to be able to practice before full medical staff/governing body review and approval to address workforce concerns related to COVID-19."[32] Centers for Medicare & Medicaid Services, COVID-19 Emergency Declaration Blanket Waivers for Health Care Providers (May 24, 2021), https://www.cms.gov/files/document/summary-covid-19-emergency-declaration-waivers.pdf.

But as with Texas's pandemic-related liability waiver, discussed above, there is nothing about the CMS waiver that *requires* a hospital's medical staff to bypass the normal federal credentialling requirements, nor is there anything about the CMS waiver that authorizes a court to mandate credentialing of a specific physician. *See id.* Again, this waiver operates as a shield, not a sword, and as such it cannot form the basis of a claim for declaratory judgment.

### 4. The Right to Try Act is inapplicable.

The same is true of the Right to Try Act. Right to Try Act, 84th Leg., R.S., ch. 502, § 2, 2015 Tex. Gen. Laws 1863, 1864–65 (eff. June 16, 2015) (currently codified at Tex. Health & Safety Code Ann. ch. 489). Mrs. Jones's trial counsel argued that this

---

[32]The parties dispute whether this waiver applies to Huguley. For purposes of our analysis, we assume without deciding that it applies to Huguley.

Act[33] gives patients "the fundamental right" to request experimental drugs. But the statute is not as broadly written as Mrs. Jones's counsel suggests.

First, it does not give a terminally ill patient the fundamental right to use a medicine off-label. By its own terms, the Act allows a terminally ill patient to use only an "investigational drug, biological product, or device." *See* Tex. Health & Safety Code Ann. § 489.001 (providing definitions). A medicine qualifies as an "investigational drug" if it "has successfully completed phase one of a clinical trial but has not yet been approved for general use by the [FDA] and remains under investigation in the clinical trial." *Id.* § 489.001(1). And while Mrs. Jones offered evidence that Ivermectin has already been approved by the FDA for unrelated illnesses, and that it may have an effective off-label use in the treatment of COVID-19, using a drug off-label is not the same thing as using it after a phase-one clinical trial while FDA approval is pending. *See id.* § 489.001(1).

Second, much like the liability and CMS waivers already discussed, the Right to Try Act is permissive. It authorizes terminally ill patients to use investigational drugs,

---

[33]Mrs. Jones's trial counsel appears to have confused the name of the 2015 Right to Try Act, which was House Bill 21, with that of the proposed 2017 Medical Freedom Act, House Bill 661. *See* Tex. H.B. 661, 85th Leg., R.S. (2017); Right to Try Act, 84th Leg., R.S., ch. 502, § 2, 2015 Tex. Gen. Laws 1863, 1864–65 (eff. June 16, 2015) (currently codified at Tex. Health & Safety Code Ann. ch. 489). The Medical Freedom Act was intended to amend the Right to Try Act, but it did not pass. *See* Tex. H.B. 661, 85th Leg., R.S. (2017).

and it protects the physicians and manufacturers that recommend or provide such drugs, but the Act does not *require* a physician to prescribe investigational drugs. *See id.* § 489.053(a) (authorizing manufacturer to provide investigational drug to patient under certain conditions), § 489.055 (prohibiting state interference with patient access to investigational drug), § 489.151 (protecting physicians who recommend investigational drugs). Thus, the Act operates to protect patients and physicians from adverse state action if they choose to use or prescribe such a drug.[34] *See id.* § 489.055. In that way, this is yet another statute that provides a shield, not a sword.

Therefore, even speculating that Mrs. Jones intended to seek a declaration that Huguley or Dr. Seiden violated one of the four provisions mentioned in her pleadings and arguments (i.e., the four discussed above), she did not state a viable declaratory judgment cause of action based on a statutory or administrative violation.

## C. Mrs. Jones's declaratory judgment claims based on contractual violations are not supported by any evidence.

In her next declaratory judgment action, Mrs. Jones seeks a declaration that Huguley and Dr. Seiden breached their "express and/or implied contract with Plaintiff and Mr. Jones in failing to provide proper medical care."

---

[34]Mrs. Jones does not allege that an official, employee, or agent of the state is trying to block Mr. Jones's access to Ivermectin, nor did she offer any evidence that the state was attempting to block his access to the drug. *See* Tex. Health & Safety Code Ann. § 489.055.

First, there is no evidence that an express contract exists. In fact, Mrs. Jones admitted that she never signed a written, express contract with Huguley or any of its medical staff.[35]

Second, although the hospital–patient and doctor–patient relationships give rise to implied contracts,[36] such implied contracts simply reference Huguley's and Dr. Seiden's professional duties to abide by the relevant standards of care.[37] *See, e.g., Chesser v. LifeCare Mgmt. Servs., L.L.C.*, 356 S.W.3d 613, 629 (Tex. App.—Fort Worth 2011, pet. denied) (recognizing that a hospital may be liable for negligent performance of a duty it owes directly to a patient, including the "duty to use reasonable care in formulating

---

[35]Mrs. Jones vaguely references her insurance contract on appeal, but she did not rely on that contract in her pleadings or at the temporary injunction hearing, nor does she specify on appeal how this contract was allegedly violated.

[36]The parties do not dispute that Dr. Seiden has a doctor–patient relationship with Mr. Jones. *See St. John v. Pope*, 901 S.W.2d 420, 424 (Tex. 1995) ("Creation of the physician–patient relationship does not require the formalities of a[n express] contract.").

[37]Medical-malpractice claims are admittedly "imbued with both contract and tort principles," *id.* at 423, but even when framed as a violation of an implied contract, "the real issue remains one of whether the professional exercised that degree of care, skill, and diligence that professionals of ordinary skill and knowledge commonly possess and exercise," *cf. Averitt v. PriceWaterhouseCoopers L.L.P.*, 89 S.W.3d 330, 334 (Tex. App.—Fort Worth 2002, no pet.) (recognizing, in accounting context, that "[w]hether a written contract providing for professional services exists between a professional and his client or not, a cause of action based on the alleged failure to perform a professional service is a tort rather than a breach of contract"); *cf. also Isaacs v. Schleier*, 356 S.W.3d 548, 556 (Tex. App.—Texarkana 2011, pet. denied) (recognizing similar rule in legal malpractice context).

the policies and procedures that govern the hospital's medical staff"); *Mills v. Angel*, 995 S.W.2d 262, 267–68 (Tex. App.—Texarkana 1999, no pet.) (recognizing that a hospital owes duties directly to the patient such as "a duty to use reasonable care in formulating the policies and procedures that govern its medical staff and nonphysician personnel" and "a duty to exercise reasonable care in the selection of its medical staff"); *Denton Reg'l Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950 (Tex. App.—Fort Worth 1997, pet. dism'd by agr.) (same).

Even assuming that a plaintiff could state a viable declaratory judgment claim based on an alleged violation of the implied hospital–patient or doctor–patient standard of care, Mrs. Jones has neither alleged nor offered evidence to support such a claim in this case. Although Mrs. Jones seeks a declaration that Huguley and Dr. Seiden breached their implied contracts to abide by the relevant standards of care, she has not identified any standard of care that would *require* them—not merely permit them—to administer Ivermectin.[38] Mrs. Jones does not allege such a standard of care in her

---

[38]Normally, there are four elements to a medical negligence claim based on an implied doctor–patient or hospital–patient contract: "(1) a duty by the physician/nurse/hospital to act according to applicable standards of care; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury." *Denton Reg'l Med. Ctr.*, 947 S.W.2d at 950; *see Chau v. Riddle*, No. 01-04-00551-CV, 2008 WL 4836500, at *3 (Tex. App.—Houston [1st Dist.] Nov. 6, 2008, no pet.) (mem. op.); *Mills*, 995 S.W.2d at 267; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13) (defining health care liability claim). Here, though, Mrs. Jones is not pursuing a medical negligence claim but is recasting her medical

31

petition, nor did she offer any evidence tending to support its existence at the temporary injunction hearing.[39] *Cf. Chesser*, 356 S.W.3d at 629 (recognizing that "[i]n cases involving alleged administrative negligence [by a hospital] arising out of or relating to the provision of medical services, the trier of fact must be guided by medical expert testimony"); *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 409 (Tex. App.—Fort Worth 2003, no pet.) ("While the standard of administrative care at a hospital may be established by lay testimony, medical expert testimony is required where, as here, the underlying issue involves the performance of medical procedures."); *Mills*, 995 S.W.2d at 268 (recognizing that "[t]he medical standard of care is the threshold issue that a plaintiff must establish before the fact finder determines if the defendant deviated from the standard of care," and "[a]s a general rule, expert testimony is required").

Instead, the evidence Mrs. Jones presented at the temporary injunction hearing attempted to prove, at best, that some doctors prescribe and administer Ivermectin for active COVID-19 infections, and that it should be *permitted* as part of the medical standard of care for those patients.

---

negligence claim as a declaratory judgment claim based on Huguley's and Dr. Seiden's alleged breaches of unidentified standards of care.

[39]We do not imply that, if Mrs. Jones had alleged a standard of care requiring the administration of Ivermectin, she would necessarily be entitled to court intervention.

But a medical standard of care that *permits* use of a given medication is not the same thing as a standard of care that *requires* the drug's use.[40] "Without more facts, [Mrs. Jones] appears to have merely presented the trial court with a difference in opinion regarding the treatment of [COVID-19]," and "[c]ourts have disavowed any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . upon allegations of mere . . . difference of opinion." *Muniz*, 2008 WL 2764518, at *3 (holding trial court properly denied temporary injunction where inmate alleged failure to provide adequate medical treatment); *see Weidner v. Marlin*, No. 04-96-00160-CV, 1997 WL 531129, at *9 (Tex. App.—San Antonio Aug. 29, 1997, no writ) (not designated for publication) (recognizing that where the "evidence established that there are legitimate differences of opinion relating to matters of medical prognosis," a physician's judgment would not constitute negligence). Therefore, even if the evidence showed that Mr. Jones were still actively infected with COVID-19, Mrs. Jones would not have carried her burden to obtain a temporary injunction regarding a violation of the standard of care.

---

[40]Mrs. Jones argues that her husband "will die if [Ivermectin] continues to be denied him." Although all involved, including this court, recognize the dire situation of the Jones family, we nevertheless cannot allow the trial court's order to stand despite the lack of supporting evidence in the record and in light of this case's procedural posture. The law is clear that a bad result does not, standing alone, demonstrate a breach of the applicable medical standard of care. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.303(e)(2).

But, once again, it is undisputed that Mr. Jones no longer has COVID-19, and Mrs. Jones offered no evidence that the medical standard of care for treatment of lung-damaged post-COVID-19 patients involves Ivermectin at all.[41]  And since Mrs. Jones did not allege, identify, or offer evidence tending to support a medical standard of care that would require administration of Ivermectin for COVID-19 aftereffects, there was no evidence tending to support that the standard was breached, either.

Mrs. Jones thus did not allege a valid implied-contract declaratory judgment claim, nor did she offer evidence tending to support it.  And "a trial court has no discretion to grant injunctive relief without supporting evidence." *Morrison v. Gage*, No. 02-15-00026-CV, 2015 WL 4043260, at *3 (Tex. App.—Fort Worth July 2, 2015, no pet.) (mem. op.) (citing *Operation Rescue–Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 560 (Tex. 1998)); *see SISU Energy, LLC*, 2020 WL 4006725, at *7 (same, quoting *Morrison*).

## D.     Mrs. Jones's declaratory judgment action based on alleged violations of the Hippocratic Oath is not viable.

Mrs. Jones's final pleaded declaratory judgment cause of action fares no better. In it, she seeks a declaration that Huguley and its staff "breached their collective

---

[41]Mrs. Jones implicitly admits as much by noting that, on the one and only occasion when Dr. Bowden was asked about the efficacy of Ivermectin for post-COVID-19 patients, she briefly referenced that she had treated "long-haul COVID" patients, but then the questioning turned in a different direction before Dr. Bowden could describe what that treatment entailed.

obligation and oath to 'do no harm' as it relates to Defendants' unjustified refusal to administer medical and pharmaceutical therapy to Mr. Jones in an effort to save his life which has been ordered by Dr. Bowden."

Although a doctor does owe his patient an implied duty to "do no harm," *see* Hippocrates, Of the Epidemics bk. 1 § 2(5) (Francis Adams trans.) (400 B.C.), this is merely an oversimplified way of referring to the implied doctor–patient contract. *Cf., e.g.*, *Baty v. Futrell*, 543 S.W.3d 689, 699 (Tex. 2018) (Johnson, J., dissenting) (concluding that expert report essentially "just say[ing] 'do no harm'" was insufficiently specific to identify the precise standard of care in medical malpractice case); *Acharya v. Gomez*, No. 05-18-00833-CV, 2019 WL 1923213, at *5 (Tex. App.—Dallas Apr. 30, 2019, pet. denied) (mem. op.) (holding that expert report adequately specified professional standard of care in medical malpractice case because the report "provided more detail than 'do no harm' as the applicable standard of care"); *Celebrity Healthcare Mgmt., LLC v. Stancu*, No. 05-17-00557-CV, 2017 WL 5559177, at *2 (Tex. App.—Dallas Nov. 17, 2017, no pet.) (mem. op.) (holding plaintiff alleged a health care liability claim where petition specified ways in which dental office violated "the most basic medical ethic, first do no harm"). But as we held above, Mrs. Jones did not identify or offer evidence tending to support her implied-contract theory; the record contains neither an allegation nor any evidence showing that the standard of care for post-COVID-19 ICU patients involves, much less mandates the use of Ivermectin.

Because the trial court could not issue a temporary injunction unless Mrs. Jones alleged a viable cause of action and offered evidence tending to support it, and because Mrs. Jones did not allege or offer evidence tending to support any of her pleaded declaratory judgment causes of action, the trial court was powerless to issue the requested injunction.[42]

---

[42]We further note that, even if Mrs. Jones's declaratory judgment claims had been valid, and even assuming she had a probable right to recover on those claims, she did not request a temporary injunction granting Dr. Bowden temporary ICU privileges; there is a mismatch between Mrs. Jones's pleadings and the trial court's injunction.

Mrs. Jones's petition asks the trial court for both temporary and permanent injunctive relief "[o]rder[ing] . . . that the Defendants comply with Dr. Bowden's order and prescription to administer Ivermectin to their mutual patient, Mr. Jones." This request is repeated multiple times throughout the petition; in one portion of her petition Mrs. Jones asks the court to "compe[l] the Defendants to recognize Dr. Bowden's medical order and prescription and requir[e] the Defendants to administer Ivermectin," and elsewhere she asks the court to "enter an order declaring that Defendants comply with (1) her reasonable requests as Mr. Jones's Wife; and (2) Dr. Bowden's order and prescription to administer Ivermectin to their mutual patient, Mr. Jones." Mrs. Jones's motion for a temporary injunction is similar; in it she repeatedly asks the trial court to "[o]rder Defendants to . . . administer Ivermectin." Mrs. Jones's pleadings are thus abundantly clear as to the nature of the temporary and permanent injunctive relief she seeks: an order compelling Huguley and Dr. Seiden to administer Ivermectin.

It is equally clear, then, that neither Mrs. Jones's live petition nor her motion for a temporary injunction mention anything about forcing Huguley to grant ICU privileges to Dr. Bowden. In fact, Mrs. Jones's pleadings do not mention hospital credentials at all.

"Courts are without authority to grant injunctive relief beyond or in addition to that for which there is specific pleading." *Am. Precision Vibrator Co. v. Nat'l Air Vibrator Co.*, 764 S.W.2d 274, 280–81 (Tex. App.—Houston [1st Dist.] 1988); *see Wiese v.*

36

## V. Conclusion

In sum, the judiciary is bound by the law, and in this unique context, the law does not allow this court, the trial court, or any other court to substitute our nonmedical judgment for the professional medical judgment of health care providers—whether we agree with their decisions, have serious doubts about them, or disagree with them entirely. Under the facts of this case, the trial court had no legal authority to intervene in Huguley's legal exercise of its discretion to grant, deny, or limit Dr. Bowden's ICU credentials. As another court has observed, the fact of the matter is that we can give

_Heathlake Cmty. Ass'n, Inc._, 384 S.W.3d 395, 399 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("A party seeking an injunction must be specific in pleading the type of relief sought because courts are without authority to grant relief beyond what is requested."); _Computek Comput. & Off. Supplies, Inc. v. Walton_, 156 S.W.3d 217, 221 (Tex. App.—Dallas 2005, no pet.) (similar); _Texoma Med. Ctr., Inc. v. Brannan_, No. 05-94-00465-CV, 1995 WL 81301, at *3 (Tex. App.—Dallas Feb. 28, 1995, no writ) (not designated for publication) (holding trial court erred by issuing temporary injunction that exceeded the scope of the pleadings and explaining that "[a]s a prerequisite to the granting of an injunction, the pleadings and prayer must state the particular form of injunction sought . . . and a court is without jurisdiction to grant relief beyond and in addition to that particularly specified"). The trial court did not have the discretion to fashion its own injunctive relief different from that requested in Mrs. Jones's pleadings. _See Harbor Perfusion, Inc. v. Floyd_, 45 S.W.3d 713, 718 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.) ("[W]here the injunctive relief granted exceeds the relief requested by the applicant in the petition, the trial court exceeds its jurisdiction."). Because Mrs. Jones did not request an injunction compelling Huguley to grant Dr. Bowden ICU privileges, the trial court could not issue the temporary injunction.

However, because the appellants do not raise this issue on appeal, we do not rely on this basis for our decision.

the Joneses our sympathies and prayers, but not an injunction, because the law simply does not permit us to do so.[43]

We reverse and vacate the trial court's temporary injunction order.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: November 18, 2021

---

[43] *See DeMarco v. Christiana Care Health Servs., Inc.*, CV 2021-0804-MTZ, 2021 WL 4343661, at *1 (Del. Ch. Sept. 24, 2021) (concluding that "[t]he patient has this Court's sincerest sympathies and best wishes, but not an injunction" where patient's wife requested mandatory injunction compelling hospital to administer Ivermectin).